**MOBIL OIL CORPORATION**

v.

**W. R. GRACE & COMPANY.**

Civ. No. 14589.

United States District Court, D. Connecticut.

Nov. 2, 1973.

Thomas F. Parker, Gross, Hyde & Williams, Hartford, Conn., George B. Finnegan, Jr., Granville M. Pine, John A. Diaz, David H. Pfeffer, J. Robert Dailey, Morgan, Finnegan, Durham & Pine, Sanford M. Litvack, Clarke W. Brinckerhoff, Donovan, Leisure Newton & Irvine, New York City, for plaintiff.

S. Robert Jelley, Wiggin & Dana, New Haven, Conn., William K. Kerr, Herbert F. Schwartz, John E. Nathan, Fish & Neave, William J. Gilbreth, Eric. C. Woglom, William J. Hone, New York City, for defendant.

## MEMORANDUM OF DECISION

CLARIE, District Judge.

The plaintiff Mobil Oil Corporation (Mobil) filed its complaint in this patent infringement suit on May 29, 1967, in the Southern District of Texas. It named as defendants the W. R. Grace & Company (Grace), a Connecticut corporation having a place of business in Houston, and Pontiac Refining Company (Pontiac), a Texas corporation located in Corpus Christi, Texas, a division of Champlin Petroleum Company (Champlin).

After the case had been assigned for trial at Houston on April 12, 1971, counsel for the parties learned for the first time of that Court's insistence that they stipulate to the trial of this case before a Special Master. The defendant Grace then moved for a restructuring of the parties so that the primary litigants, Mobil and Grace, might have a court trial in the District of Connecticut pursuant to the provisions of 28 U.S.C. § 1404(a). Notwithstanding the fact that Mobil vigorously resisted Grace's transfer motion, the Texas court did, on May 28, 1971, issue an order that the action against Pontiac-Champlin, a customer of Grace, be severed and that its case be stayed on the docket until final disposition of the principal litigation, and that the case between Mobil and Grace be transferred to the District of Connecticut for trial. After the plaintiff's mo-

tion to stay and for a rehearing of said order were reviewed on appeal, the transfer was finally effected on August 25, 1971. Mobil Oil Corporation v. W. R. Grace & Company, 334 F.Supp. 117 (S.D.1971), 170 U.S.P.Q. 582 (S.D.Texas 1971), affirmed from the bench, 5th Cir., September 1, 1971, without opinion.

Mobil's amended complaint claims that Grace has infringed three of the plaintiff's United States letters patent. Each of these patents, the defendant concedes, was jointly issued to Charles J. Plank and Edward J. Rosinski, who assigned them to their employer, Mobil. They are: (1) Patent No. 3,140,249 ('249), applied for under patent application Serial No. 42,284 on July 12, 1960 and issued July 7, 1964, entitled "Catalytic Cracking of Hydrocarbons with A Zeolite Catalyst Composite; (2) Patent No. 3,140,253 ('253) applied for under Serial No. 364,301 on May 1, 1964 and issued July 7, 1964, entitled, "Catalytic Hydrocarbon Conversion with A Zeolite Composite Catalyst;" and (3) Patent No. 3,436,357 ('357), applied for under Serial No. 195,430 on May 17, 1962, and issued April 1, 1969, entitled "Catalyst Conversion of Organic Compounds in the Presence Thereof." These patents will expire together on July 7, 1981, because Mobil voluntarily disclaimed through the Patent Office that portion of the statutory term, which otherwise would have attached to the '357 patent and run until April 1, 1986. This Court finds that each of the claims in issue in the three patents are valid and enforceable; and that they have been infringed by the defendant Grace as alleged by the plaintiff.

These patents relate to gas oil cracking catalysts, and are composed of a composite of an amorphous (non-crystalline) matrix, such as silica-alumina gel, together with a crystalline aluminosilicate. The latter substance is more commonly referred to in the art as a "zeolite" or a "molecular sieve" type catalyst. Upon the commercial recognition of the advantages of zeolite component catalysts in 1962, they rapidly displaced

the "amorphous silica-alumina" catalysts for industrial gas oil cracking purposes.

Mobil has requested the Court to grant injunctive relief against further direct infringement, contributory infringement, or the inducement of infringement by Grace or others who are subject to the latter's control. It seeks an accounting and damages caused by the alleged unlawful acts of the defendant and requests that the Court impose treble damages, together with all court costs and attorneys' fees. Both parties stipulated that the question of the quantum of damages should be deferred in this action until the issues relating to patent validity, infringement, and enforcement have been resolved.

Grace, in its answer and counterclaim, interposed the defenses of non-infringement, invalidity, and the unenforcibility of the patents due to patent misuse, as well as a counterclaim for damages and injunctive relief under the anti-trust laws. However, the parties have stipulated in the pre-trial order approved by the Court on November 11, 1971, that the defendant's counterclaim seeking damages and injunctive relief arising out of the plaintiff's alleged violation of the anti-trust laws should be dismissed without prejudice; therefore, that counterclaim is no longer in this case.

### Jurisdiction

The complaint of Mobil alleges the infringement by Grace of three interrelated United States patents concerning "zeolite" hydrocarbon cracking catalysts. They are presently owned by Mobil as the assignee of the original patentors. Jurisdiction and venue are properly found in this Court under 28 U.S.C. §§ 1338(a) and 1400(b).

### Issues

The present title ownership of the three patents is not in dispute. Both parties have agreed in their stipulated pre-trial order, that Mobil is, and always has been the lawful owner of the entire right, title, and interest in and to the '249, '253, and '357 patents, together with all patent applications identified in said patents, by virtue of the aforesaid assignment. The specific issues to be resolved are: (1) whether or not claims Nos. 1, 15 and 19 of patent '249, claims Nos. 19, 23, 24, 28 and 32 of patent '253, and claims Nos. 7, 9, 10, 17, 19 and 20 of patent '357 satisfy the criteria for patent validity embodied in 35 U.S.C. §§ 103, 102(e) and 112; (2) whether or not the patents in suit are enforceable in light of the Mobil attorneys' alleged conduct during the prosecution of said patents in the United States Patent Office, or because of its subsequent licensing policy and practices, and; (3) whether or not Grace, by its manufacture, sale, offering for sale, or use of the accused products has copied, or deliberately and wilfully, directly or contributorily, infringed any of the aforesaid patent claims, or induced others to do so, under 35 U.S.C. § 271(a), (b) and (c).

### Defendant Grace's Defenses

Grace advances three basic defenses: (1) that the patents are invalid; (2) if they are valid, they have not been infringed, and; (3) they are not otherwise enforceable. The defendant contends that the three patents did not constitute a substantial contribution to the technology of the prior art and would have been obvious to one knowledgeable in this highly skilled art at the time the alleged inventions were claimed to have been made. More specifically, the defendant claims that the '249 patent, which is the basic patent, lacks newness, novelty, and anticipation in the light of prior ideas patented, as required by the statutory standards in 35 U.S.C. § 102(e).

Grace minimizes the significance of these new catalysts by pointing out that essentially, the '249 patent simply provides for distributing an alkali crystalline zeolite component into a silica matrix in the form of an oxide gel and base exchanging out the sodium alkali to a content of less than one per cent. The zeolite component in the composite cata-

lyst has a rigid three dimensional network structure and is comprised of spheroidal particles with uniform pores.

The defendant asserts that the '253 describes a two component catalyst produced by mixing a specific zeolite aluminosilicate ingredient into a matrix, except that it is required that the zeolite ingredient contain rare earth ions which, it is claimed, provide greater stability together with hydrogen ions or hydrogen precursor ions. It also requires that the sodium ions still associated with the zeolite after base exchange should not exceed 25% of the amount of sodium ions normally associated with the zeolite containing only sodium ions. The scope of various aluminosilicates encompass 13 synthetic zeolites, including "zeolite X" and 16 natural zeolites. The '357 patent includes not only the zeolite plus the matrix type catalyst, but is supplemented by a secondary solid additive clay to open it up and increase its diffusivity so that the feedstock may permeate it more readily.

Grace claims that the silica-alumina matrix components in all three patents was an old idea and previously well known as commercial cracking catalysts and that the zeolites X and Y discovered and patented by Milton and Breck, respectively, became available at about the time that work on the patents in suit was undertaken. Grace claims that the methods and steps used for incorporating the crystalline component in the matrix to produce the composite catalyst were simply reproductions of prior art methods.

Grace further points out that long before the new synthetic zeolites X and Y became commercially available, it was commonly known in the industry that sodium was a catalytic poison and an undesirable material in cracking catalysts. It contends that the Kimberlin patent (DX–AJ), applied for February 5, 1957, issued February 14, 1961, and assigned to Esso Research & Engineering Company, discloses the replacement and reduction of sodium by base exchange as an essential requisite (Turkevich Tr. 1987–1988, 2071). The defendant argues that the low sodium limitation provided in the '249 patent does not qualify as an inventive contribution, and bolsters its claim in this regard by reference to the Fleck patent (DX–AN), which was filed December 14, 1956, and assigned to the Union Oil Company; the Thomas patent issued in 1939, (DX–AA, Tr. 1909) and restated by Ahlberg issued February 6, 1945 (DX–AB, Tr. 2067).

With respect to the '253 patent, Grace claims that the inventors cannot take credit for an original contribution to the art, that rare earth exchanged zeolites possessed enhanced cracking characteristics, because that too was contained in the prior Kimberlin patent and was also the subject of the Bourguet and Hart patent (DX–AK) which was later assigned to Mobil (Tr. 1998–2004). The defendant asserts that Dr. Plank and Rosinski were preceded in this field by their co-workers, Frilett and Weisz (Tr. 1419–1438), and that the rare earth acid form of catalyst was part of the prior art references, when read in their totality, as disclosed in the Rabo patent (DX–AM–2 and AL–2).

Grace pictures Mobil's '357 patent as being in principle within the same ion exchange concepts of prior art taught under the '253 patent, except that the composite catalyst had a third component, the secondary solid clay additive, to increase diffusivity. Grace claims that in weighing the inventor's alleged efforts to improve catalytic cracking during the period from 1940 to 1962, the Court should disregard that, because it was not until the mid-1950's that the large porous synthetic zeolites, such as X and Y, became commercially available to use in a composite catalyst; and they were merely engrafting details onto a pre-existing structure of technology. Grace claimed that Kimberlin and Rabo were the first to discover the potential promise of large pore zeolites for catalytic cracking purposes and the plaintiff has recognized this by taking licenses

from Union Carbide on the Milton "X-type zeolite" and the Breck "Y-type zeolite." It is Grace's position that Dr. Plank and Rosinski were simply diluting the zeolite component in the matrix and further diluting it by the introduction of the clay additive.

In addition to the prior art defense, Grace asserts a secondary posture: that the patents are invalid under 35 U.S.C. § 112, because they have failed to set forth with completeness and definiteness the specifications of the patent claims. Grace claims that the references in the patent claims relate to uniform pores and that it has specific ions or cations associated with it; and that at the time the application was filed in 1961–1962, there was no known test available to science by which the presence or absence of these claimed characteristics could be scientifically ascertained.

On the issue of infringement, Grace declares that it does not prepare its zeolite containing catalysts according to the patent claims in suit; that its catalyst particles are not spheroidal shaped and that the zeolite components do not have uniform pore openings; and that its matrix is not an inorganic oxide gel. Grace's final defense is that the patents are not enforceable because Mobil was not completely forthright in presenting the patent applications to the Patent Office examiners and that the plaintiff has used the patents illegally to expand its patent monopoly.

### General Background Information on the Evaluation of These Patents

Petroleum refining commenced in the United States in 1859 when oil was discovered in Pennsylvania (Tr. 152). As this natural resource is pumped from the ground, it is comprised of a mixture of large and small hydrocarbon molecules. The earliest techniques for refining crude petroleum for commercial use was the mechanical process of distillation. The applicable chemical principle was that the more volatile materials would be vaporized and then condensed, so as to physically separate them from the less volatile parts. This distilled product was generally called "straight run" gasoline. The chemical properties permitted the various sized molecules to be fractioned off at different temperature levels, because the larger molecules required a higher boiling point than the smaller. Each of the separate fractions were not only chemically different in composition, but had distinct physical characteristics of their own. They included light naptha, heavy naptha, gas oil (which required further cracking into gasoline and kerosene), together with the heavier and larger molecules, such as lubricating oils, heavy asphalt, and tar (Tr. 146). The petroleum carbon atoms are theorized to be structurally arranged in a straight chemical chain with hydrogen atoms surrounding each of these carbon atoms. It is the function of a catalyst to accelerate cracking reactions by converting the higher boiling materials into lower boiling materials and in this manner much additional gasoline can be made by "cracking" a portion of the heavier crude oil residue classified as "gas oil." This cracking breaks up the long heavy gas oil molecule chains into smaller ones and they, in turn, are converted into a greater volume of the end product, gasoline. How the catalyst actually accomplishes this is not yet fully understood by the chemist nor fully explainable by science. Rather, it is the subject of much scientific postulation and theorization.

That part of petroleum oil categorized in the realm of gasoline boils between 80° and 420° Fahrenheit, while the remaining gas oil constituents boil at varying heat levels from 450° upward to a tar or asphalt classification, which latter substance boils about 1100° Fahrenheit. It is in these high temperature categories that the principle of catalytic cracking has successfully operated to convert more of the gas oil constituents into commercial grades of high octane gasoline, which would otherwise be waste by-products and of comparatively little monetary value.

The commercial process of thermal gas-oil cracking commenced in 1913, when heat was applied to break down the larger hydrocarbon molecules into smaller ones, thus causing the latter to possess chemical and physical characteristics different from their derivatives (Tr. 158). The gasoline being produced by this method was a low octane [1] gas of between 65–70° octane (Tr. 162), and it was not of a quality satisfactory to burn in high octane designed automotive engines, nor was it suited to the prospective development of ever increasing engine compression ratios (Tr. 158–160).

Catalytic cracking came into use about 1939–1940 and was first commercially developed by the Houdry Processing Corporation. The cracking technique was carried out by circulating the gas oil in contact with the catalyst, silica-alumina, in an environmental chamber of very high temperature. The gas oil feedstock was first preheated to 600–800° Fahrenheit and then as it came into contact with the catalyst in the reactor, the heat was increased to about 1100–1300° Fahrenheit. The resulting reaction caused the larger molecules to break down into smaller molecules equivalent to the gasoline boiling range (Tr. 161). This process produced a fairly high quality of gasoline having an 89 to 92 octane rating and a greater conversion quantity of gasoline from the same volume of gas oil. Two physical forms of the silica-alumina catalyst were generally used. The pellet or bead type (about one-tenth inch in diameter) was used in both the moving-bed and fixed-bed process, while the powdered or granulated form was used in the fluid catalytic cracking process.

Contrary to the common chemistry book concept that catalysts themselves do not enter into or undergo change, this catalytic cracking process with the silica-alumina catalyst caused the hydrocarbon gas oil to inter-react and deposit a quantity of coke so as to adhere to the catalyst. As this coke accumulated and gunked up the exterior surface of the catalyst, it cut off the access of the gas oil from entering into the pores of the catalytic material, so as to cause it to lose its porosity and rendered it chemically ineffective, since the molecules could not readily enter into the pores of the catalyst and permit the products to diffuse out. The catalyst itself actually entered into the reaction here and underwent both a physical and chemical change (Tr. 168). This phenomenon required the industrial refiner to so construct and regulate the cracking process so that the coke could be readily burned off to restore the catalyst to its original effective chemical level. The accumulation of the unwanted coke represented not only a loss in the conversion volume of the end product (gasoline), and a substantial capital construction investment to complete the burning off process, but required additional process time in the catalytic cracking operation to restore the catalyst to its original responsive activity level (Tr. 171).

The production control exercised by the refiner in the fixed-bed catalytic cracking process over the ratio of the percentage of gasoline produced had to be weighed against the unwanted by-products of dry-gas and coke and the maintaining of a constant level of activity in the catalyst. The gas oil would be passed through a reactor chamber containing the preheated catalyst, where the molecules were broken down and changed. The catalyst was then required to be purged of any remaining volatile oil through the introduction of hot steam. Air would then be ingested into the regenerative chamber, where the carbon or accumulated carbon was burned off of the surface area of the catalyst. This procedure was found to be economically unfeasible, because it took 80° of the process time cycle to burn off the coke during the period of regeneration, while the effective cracking period during which it was effec-

---

1. "Octane" is a measurement of the detonating quality of gasoline in the cylinder of an internal combustion engine.

tively employed for conversion purposes utilized only 20% It took four times as much time to recondition the catalyst for future use as it did to utilize it in the productive cracking process (Tr. 171). This inefficiency led to the introduction of the moving-bed process for commercial use. In this latter process, the petroleum hydrocarbons were cracked as they moved through the reactor in the form of vapors and at a speed independent of a non-turbulent slowly moving body of solid catalyst beads (Tr. 276–285; 2258–2259).

The physical form of the catalyst used in the moving-bed process was the pellet or bead type, about the size of small peas, which Mobil marketed under the tradename "Durabead." In contrast, the fluidized cracking process used tiny powdered catalyst particles, deliberately prepared so as to vary in size to encourage mobility, and the hydrocarbon vapors would move with these catalyst particles in a turbulent state, at approximately the same velocity through the reactor chamber (Tr. 284; 2258). The moving-bed and fluidized type of catalyst were composed of the same basic chemical material and the chemical reactions were fundamentally the same, although the problems of stability were different in the fluid units as distinguished from the moving-bed units (DX–PQ–p 0018, DX–AAQ). On occasion, the fluid-bed catalyst was prepared by milling or grinding the pelleted or extruded catalysts, sizing them to provide a proper distribution of the tiny particles in order that they could be fluidized through the system (Tr. 3115).

In the commercial cracking fluidized unit, gas oil is pumped into the system at the bottom of the riser column (PX–355). It is then preheated to a temperature approximating 600–800° Fahrenheit to maintain a constant heat balance throughout the process. The catalyst is also preheated to a temperature approximating 1100–1300° Fahrenheit. Depending upon the ratio of the volume of oil, the velocity at which it is pumped through the system, and the quantity of

catalyst, the contrasting temperatures reach equilibrium at about 875–960° Fahrenheit. As the two substances flow up the riser, about 80% of the cracking reaction takes place and the remaining 20% is completed by the time the separation is accomplished in the reacting chamber (Tr. 191). The catalyst settles in the stripper chamber, where it is treated with steam and is shunted-off into the regenerator to be burned free of carbon at temperatures as high as 1550° Fahrenheit. The cycle is continuous and is completed approximately 360 times in each 24-hour period. These commercial units continuously operate as long as two years at a time, until the catalyst as replenished is considered worn out. The gaseous vapors containing gasoline, non-liquid gas and unconverted gas oil, escape out of the vapor outlet to the refinery where further distillation processes are completed.

During the calendar year 1960, 1.2 billion barrels of gas oil were processed in the United States and this product had an approximate annual value of 2.5 billion dollars (Tr. 200). The gas oil being processed used as the cracking catalyst, silica-alumina, which was subsequently only 40% productively efficient in gasoline yield. In comparison, the patented zeolite catalyst, which is the subject of this litigation, increased gasoline yield by more than 20% over the old silica-alumina, depending in part on the depth of the cracking carried out. Almost equally important is the fact that 24% less dry gas and 39% less coke was produced compared with the former methods (PX–2, '249 patent Example 3). The advance was a most significant scientific achievement in catalytic action in the petroleum refining field.

The evidence discloses that Grace commenced negotiations with Mobil in 1962, seeking to acquire a license to manufacture and sell the new catalyst and had even discussed the possibility of a joint venture arrangement (Tr. 2739, 2740). However, nothing was finalized from those discussions. At that time Grace was one of the largest and foremost pro-

ducers of commercial catalysts in the oil refining business. From July 1964, until the commencement of this suit in 1967, it sought to license one or more of these Mobil patents in order to eliminate any conflict with Mobil's claims for commercial production of the new catalyst.

The dispute primarily centered around the amount of royalty. Mobil initially asked for a 25% royalty on the catalyst's sale price, while Grace offered 10%. In December 1965, the parties finally agreed upon a 12% royalty (DX–TC, Goodall Tr. 2872–2875). Although there appeared to be agreement, no license agreement was actually signed. In February 1966, the Rabo patent issued and Grace discovered that Esso, the assignee-owner of the Kimberlin patent, might procure a reissuance of that patent with broader and more encompassing claims. The patent had originally issued in August, 1962, about six months after Mobil's announcement of its '249 zeolite catalyst. It became the negotiating policy of Grace to try to delay taking any license from Mobil until the question of the ownership of other inventions had been resolved (Tr. 3038–3044). There was genuine concern that, should the patent office grant the Kimberlin reissue claims to Esso, the latter might dominate and block the use of the new Mobil patents (Tr. 2785). This concern was not unreal for it was of sufficient significance to warrant Mobil's negotiating an agreement with Esso, wherein Mobil was authorized to grant sub-licenses under the Esso patents in the zeolite field, at such time as they were granted their pending patent, and to pay Esso a part of the royalties which Mobil collected (Tr. 3064).

Between 1940 and 1962, prior to the introduction of the plaintiff's patented zeolite crystalline-composite catalyst with which we are concerned, there was only one catalyst that enjoyed any substantial commercial use. That was the conventional silica-alumina catalyst which was in general use throughout the industry. It was made from either natural sources (clay) or synthetically from standard chemicals. It was an amorphous material that had no fixed form or shape. The pores in the amorphous material were random in size and location. Contrasted with this were the crystalline zeolite materials which had fixed, definite internal structures or shapes with the silica-alumina particles having porous properties which permitted the vaporized gas oil to enter and inter-react with the surfaces within the crystalline catalyst particles so as to improve the effect of the cracking process. While the use of the standard amorphous silica-alumina catalyst converted a substantial percentage of gasoline yield from a fixed amount of gas oil feedstock, it also produced excessive amounts of waste by-products, in the form of dry gas and coke.

The four chief properties sought after in developing a desirable cracking catalyst were: (1) *activity*, the rate at which the catalyst is capable of converting gas oil (feedstock) into other products; (2) *selectivity*, the ability to direct the reaction so as to produce the maximum yield of gasoline; (3) *stability*, the constant maintenance of efficient catalytic qualities in an environment of high temperature and exposure to steam under pressure; and (4) *attrition resistance*, the ability to retain its physical and chemical properties without being consumed or destroyed in the commercial cracking process. This latter quality of attrition resistance is significant, because it determines the amount of fresh new catalyst that must be continuously added as makeup (Tr. 202–207). While experimental laboratory testing is essential to find and develop the desirable qualities sought, a successful result is not necessarily measured solely by the scientific laboratory experiment. A laboratory success can be a commercial failure, unless industrial quantities can be economically produced in commercial plants under massive volume processing conditions.

The industrial race for the key to finding this golden fleece impelled the giants of the petroleum industry with

almost unlimited resources to engage in a fierce competitive research-race to crack the seemingly impregnable scientific barriers. The financial incentive was obviously enormous, because even a mere 1% increase in gasoline yield over the amorphous silica-alumina catalyst then in use would be worth over $80,000 per day, or 20 million dollars per year to the industry (Tr. 225). The total savings to the petroleum refinery industry for the period 1962 through 1970 would approximate 2 billion dollars (Tr. 1877).

Illustrative of the intensive search carried on during this lengthy period from 1940–1962, the Houdry Process Corporation, a pioneer in the field of catalytic cracking, alone employed 35 expert and professional people devoted to a solution of the problems of catalytic research during 1947–1958. Three thousand new ideas resulted from that research, but no catalyst was discovered better than silica-alumina (Tr. 224–227, 3119). The defendant Grace, during the period between 1955–1962, filed 21 new patent applications directed toward the improvement of the old amorphous silica-alumina catalysts, but with no meaningful success (Tr. 241–244, PX–738, tab 14). Until 1962, when the Mobil patent '249 came on the market, the gas oil cracking catalyst art had made no significant improvement in petroleum catalytic cracking during 20 years of well-organized, active, and expensive research effort in this sensitive catalytic field of chemical magic and unpredictable results.

### The Patented Invention

Through the shadows of this background setting, Plank and Rosinski, brought light. These two inventors were both research chemists in the employ of Mobil in 1956 working with numerous other scientists on catalytic research at its Paulsboro, New Jersey, laboratory. Dr. Plank had worked for Mobil since April 1, 1941, but had been in the catalyst research group continuously since 1955; Rosinski, his colleague, had been working continuously in the development group since 1947 and in the catalyst research group since 1956 (Plank Tr. 2659–2660). Mobil, like everyone else in the industry, was at that time still using the amorphous silica-alumina type of catalyst (Rosinski Tr. 320–321).

In February 1956, as a result of extensive chemical research, Rosinski postulated the theory that it might prove advantageous in improving catalytic activity and selectivity if, instead of using the usual amorphous silica-alumina particles having non-uniform shaped pores and variable diameters of 5 to 200 Angstroms,[2] it might be possible to generate from within the catalyst itself the formation of uniform pores which would be large enough to screen and admit only the gas oil molecules, yet sufficiently small to confine the molecules in such a manner as to cause them to have maximum contact with the interior pore surfaces of the catalyst (Tr. 799, 324). Rosinski's idea was to incorporate pores of a uniform size into the conventional non-uniform pore sponge-like catalyst. The theory was that the non-uniform and the uniform pores of his resulting composite catalyst might interact and work in concert to produce a new and enhanced cracking effect (Rosinski Tr. 366–369; 789–794; PX–599; 652). To accomplish this he tried incorporating into the amorphous silica-alumina various organic materials such as rubber, latex, waxes, and protein gels, as well as starches and sugars. He would then cause these substances to be driven out by vaporizing them through thermal treatment or dissolving them in chemical solution (Tr. 366–369). Plaintiff's Exhibit 652 demonstrates the inventors' attempts at the formation of these desired uniform cavities or openings in a gel catalyst by impregnating it and then burning out these foreign materials (Tr. 370). The initial attempts to convince

2. An Angstrom is a unit of length used to measure molecular size. There are 250 million Angstroms in one inch. An Angstrom equals 100 millionth of a centimeter (Tr. 1203).

his superiors of the merits of his theory met with no success (Rosinski Tr. 799–802).

However, in mid-1956, Rosinski discussed his ideas with Dr. Plank, who had tried a similar idea without success in connection with some chemical absorbent research being done by him about 1954 (Plank Tr. 2716–2718). Plank was so impressed with Rosinski's ideas that he secured the latter's transfer to his own special research group during the first week of December, 1956 (Rosinski Tr. 316, 376, 389–390; Plank Tr. 2691–2693).

By December 10, 1956, Plank recorded in his laboratory notebook (PX–598), and discussed with Rosinski (Plank Tr. 2688–2693), the idea of mixing large pore crystalline zeolite into an amorphous silica-alumina catalyst to obtain uniform pores. Simultaneously he recorded the idea of "base-exchanging" [3] the zeolite with ammonium or hydrogen to improve the catalytic properties of the combination. The notebook entry referred to the idea as one for making "an excellent combination catalyst." The plaintiff would now claim this official recordation as the first documentation of the concept that led to the '249 patent (PX–598, p. 25341–4).

On January 25, 1957, Dr. Plank noted in his laboratory notebook (PX–79) the scientific technique of making a composite catalyst having a structure which included both uniform and non-uniform pores by dispersing finely milled crystalline molecular sieve particles having uniform pores into a siliceous gel structure (PX–140; Tr. 396), and then base-exchanging it with ammonium or hydrogen cations [4] (PX–139; PX–140; Plank Tr. 2693–2696).

The crystalline zeolites are sometimes referred to as crystalline "aluminosilicates" (Rosinski Tr. 322). They are composed primarily of three chemical elements: aluminum, silica and oxygen (Turkevich Tr. 2051). In addition, they usually have associated with them, in the form of electrically charged ions, some metal, such as sodium, magnesium, or rare earth metals (Turkevich Tr. 2049–2051). The ions of a particular metal associated with such zeolites may be replaced by, or exchanged with, ions of another metal or ions of a non-metal (e. g. ammonium). The result is accomplished by an old and conventional technique called base-exchange, in which the zeolite is washed with a solution containing the replacement ions (Rosinski Tr. 339–341; Turkevich Tr. 1965). Thus sodium ions originally associated with a crystalline zeolite may be replaced in whole or in part by magnesium ions, rare earth ions, ammonium ions, or a combination of ions [5] (Turkevich Tr. 2014–2015). Dr. Plank and Rosinski conceded that they did not invent the generic concept of crystalline aluminosilicate, base-exchanged with metal ions such as calcium, magnesium, and rare earth; or base-exchanging the same with ammonium ($NH_4$) or hydrogen (H) ions. This was done previously by Frilette and Weisz (Tr. 719–723; DX–BS; DX–BT).

When zeolite X with normal sodium content is subjected to the industrial cracking conditions of heat and steam, it will decompose as would zeolite Y. The '249 patent teaches how to treat or mod-

---

3. "Base-exchange" is an expression used to indicate the chemical reaction process by which one element in a chemical compound is replaced by another element from a treating solution. The process is employed with various types of cations in salt solutions, and involves the use of an aqueous system and the interchanging or substitution of one element for another.

4. Ions and cations for the purposes of this action are positively charged electrical atoms (Tr. 58).

5. Exchanging a sodium zeolite with an ammonium chloride solution will result in the replacement of sodium ions by ammonium ions which, upon heating, will become hydrogen ions, which are referred to as "hydrogen precursors." It is known by science that ammonium decomposes. Rosinski theorizes "that on decomposition . . . the protons generate the hydrogen . . .," although this has not as yet been proven (Robinski Tr. 761). See also note 6 infra.

ify these zeolites, so that they retain their crystallinity with uniform pore sizes, so as to render them useful in catalytic cracking. The alkali crystalline aluminosilicate is treated with solutions that contain other cations to replace the sodium in this process called base-exchange (Tr. 339–340).

Dr. Plank found that this procedure gave a better physical structure to the sieve and a more stable "NH–4 plus"[6] and "H plus" acid form of sieve. This development contradicted basic teachings in the art at that time, because the presence of any crystalline material in a silica-alumina amorphous catalyst had been believed to affect adversely its catalytic performance (PX–140).

Previously tested forms of this type would ordinarily peptize into an aqueous colloid[7] and then disappear or be destroyed by the steam and heat conditions encountered in commercial cracking. However, in the proposed invention structure, even if the catalytic particles should peptize out under mass processing conditions, they would still remain locked into the gel pores of the siliceous gel and retain their functional chemical properties (Tr. 397; 442–445; Plank Tr. 2668–2671).

In their effort to perfect an improved commercially practical catalyst, Dr. Plank and Rosinski decided to subject the catalyst to the same extreme steam and thermal conditions actually encountered in the industrial cracking process (Rosinski Tr. 467–469). Twenty-four hours steaming at about 1200° Fahrenheit is considered comparable or equivalent to 4–6 months in a cracking unit. Only if the end result could produce a greater gasoline yield with less dry gas and coke at the same conversion level from a fixed amount of gas oil could improvement be measured (PX–751; Rosinski Tr. 1450–1453).

Plank and Rosinski discussed these procedures and considered incorporating a 13–X (crystalline aluminosilicate or crystalline zeolite), (Rosinski Tr. 436), molecular sieve in a silica gel matrix and then base exchanging it with ammonium chloride to make the ammonia form, which was then treated with heat (Laboratory catalyst CP 3667). They found that the catalytic activity was far better than what they had expected from the silica-matrix alone (Tr. 399); and that it gave a greater gasoline yield than the silica-alumina alone at the same conversion level. These results were then compared with CP 3668, wherein there had been no base exchange, but had otherwise been made at the same time and tested in the same way. It was found that the latter catalyst, absent the base exchange treatment, would decompose and disintegrate. It, (CP 3668), had a low surface area and acted as a dead catalyst, because of the high residual sodium in its composition (,Rosinski Tr. 436–8; PX–90; Tr. 400–403). It was the same in all respects as CP 3667, but it had not been subjected to the ammonium sulfate base-exchange step and, as a result, contained about 2.-91% sodium. As a result, when it was exposed to steam, it became useless (Rosinski Tr. 408; 423–425; 435–439; PX–80).

The basic principles embodied in the invention of the '249 patent were actually reduced to practice around June 7, 1957, when Rosinski made the laboratory catalyst preparation (CP 3667). He incorporated the 13–X molecular sieve into a siliceous gel matrix and then base-exchanged the composite with ammonium sulfate to reduce the sodium content of the composite to 0.48 weight per cent (Rosinski Tr. 402–408; PX–79). The crystalline aluminosilicate varied from 5–40%, while the matrix varied from

---

6. The chemical symbol NH–4 plus indicates the sieve material (crystalline aluminosilicate) as exchanged with ammonium solutions (NH–4 cl) which, upon calcination, will become the acid form of the H-plus forms (Rosinski Tr. 373). See note 5 supra, and note 10 infra.

7. "A colloid is a microscopic particle that will stay suspended in liquid, and will not settle. It is so small that it will look like a liquid, like milk." (Rosinski Tr. 401).

60–95%. The bulk of the composite was matrix and the minor component was crystalline aluminosilicate (Tr. 326). Following steaming, this composite produced 4% to 5% more gasoline than the standard silica-alumina acting by itself at the new conversion level (Rosinski Tr. 439–441; 1450–1453; PX–751). The CP 3667 catalyst showed an activity of 50.12 volume per cent conversion and 36.92 volume per cent gasoline yield (Rosinski Tr. 410–11; PX–79, p. 400098).

On April 15, 1959, Plank and Rosinski commenced development of CP 4017, a low sodium (about 1%) composite catalyst, (Tr. 472), comprising a silica-alumina matrix and approximately 40% by weight of the calcium exchanged 10–X type zeolite (Plank Tr. 2703–2704; Rosinski Tr. 448–451). The sodium 13–X zeolite form was first base exchanged with calcium chloride under elevated temperatures, washed free of salts, and filtered off before being incorporated into the silica-alumina matrix. The 13–X and 10–X compositions were then compared for catalytic cracking purposes (PX–81) and PX–16). One important criterion of a good cracking catalyst is the surface area [8] on which the hydrocarbons are able to react (Rosinski Tr. 461).

The "Cat D" [9] evaluation of the unsteamed fresh catalyst (CP 4017) with sodium content (about 1% after calcination [10]) demonstrated an 80% conversion of gas oil with a 52% yield of gasoline; whereas the comparative CP 4018 fresh catalyst showed a 42.8% conversion with a 36.2% gasoline yield. No steaming tests were run on the latter, because it was recognized as being obviously unstable. However, after steaming the CP 4017, the gas oil conversion was reduced to 38.4% with a gasoline yield of 32.4% (Rosinski Tr. 457; PX–16, table 4). Thus, through this comparison it became obvious that the calcium form of 10–X, when compared with the sodium form of 13–X (CP 4018), demonstrated that the former was definitely superior. The 13–X possessed the inherent characteristics of sodium poisoning which sharply reduced its effective performance. This experiment indicated progress toward selective performance with the combination of the crystalline aluminosilicate of the 10–X calcium form in a silica-alumina matrix (Rosinski Tr. 465). In those zeolites where the sodium was removed by base-exchange and the calcium and ammonium combinations replaced it, the composite became more stable to steam and more active as a catalyst.

As additional experimental catalysts were tried and tested, CP 4253 was developed in the time period of January, 1960, (Rosinski Tr. 474), and the experimental data appears as example 3 on the cover sheet of the '249 patent (PX–2, filed July 12, 1960). It demonstrates that 21% more gasoline yield was produced, compared with the former standard silica-alumina catalyst, when evaluated under the same conversion conditions; additionally, 24% less dry gas and 39% less coke resulted (Tr. 483).

About February 16, 1960, in CP 4252 and CP 4253, Plank and Rosinski started to explore the area of combining a rare earth exchange composite with the 13–X and the silica-alumina matrix (PX–2, col. 21–22, Example 26; PX–82). Tests demonstrated that the rare earth [11] ex-

---

8. The term "interior surface area" refers to the size (in square meters per gram) of the particle's mass. Interior surface area may be measured through the use of nitrogen, which enters into the particle through its pores and adsorbs to its surface. By determining the weight of the nitrogen which has been adsorbed, it is possible to calculate the dimensions of the interior surface of the particle.

9. A "Cat D" test is a small scale laboratory cracking test in which a fixed amount of catalyst is caused to contract with a fixed amount of gas oil vapors for analytical reaction purposes.

10. "Calcination" is a process by which a substance is heated in a furnace to a temperature of 1000° Fahrenheit for approximately ten hours (Tr. 416).

11. "Rare Earth" is the term used to describe metals such as cerium, lanthanum, praseo-

changed catalysts were essentially stable and withstood steam treatment (PX–77, Fig. 40; PX–691). The multiple hours of heated steam under these tests could equal several years normal use of the catalysts in a commercial unit (Tr. 508). Several tons of fresh catalyst are ordinarily required to be regularly added and ingested daily into the average commercial cracking system in order to maintain a constant conversion equilibrium; however, even then it will ultimately wear out and deposits of the metal organics in the gas oil charge will contaminate the catalyst so as to reduce its performance. While the calcium and ammonium base-exchange forms of the catalyst showed advantages, the rare earth base-exchanged catalysts demonstrated an even further advancement (Tr. 523). The latter information became known to Mobil, before it commenced making the calcium form commercially. Therefore, it switched over to the rare earth form because of recognition of the latter's greater selectivity and stability. While a test of the calcium form internally had higher selectivity, it had thermal limitations because as the heat in the commercial units exceeded 1225° Fahrenheit, the calcium became less stable than did the rare earth form (Tr. 525).

By July 12, 1960, Plank and Rosinski filed patent application No. 42,284, the predecessor of the '249. By then they were convinced that the best metal ion to use for base-exchanging the zeolite component of their composite, considering its favorable conversion and reaction to steam, was the rare earth ion, (Rosinski Tr. 502–508, 515–516; PX–709; PX–77), and that the best composite catalyst could be produced by base-exchange with rare earth and ammonium cations (Rosinski Tr. 567–577; PX–717–A, 717–B). The '253 patent in suit embodies both of these concepts.

As of July, 1960, they had tested their laboratory experiment CP 4473 and

found it to be the most selective catalyst which they had yet developed (Rosinski Tr. 563–573). It was composed of a combination of rare earth and acid zeolite in a silica-alumina matrix, which provided even greater benefits than did the '249 patent. They found that the composite of rare earth with the crystalline zeolites became more stable and would tolerate higher levels of sodium in the composite, without lessening the desired results (PX–618). The end disclosures of this experiment were such an advance that Mobil decided to test it commercially and it became the first commercial zeolite catalyst, D–5 Fluid and Durabead–5. This break-through was the greatest single catalytic advance in 27 years (PX–603, p. 17), and it was announced to the trade on March 22, 1962, as a new and startling advancement in the oil catalytic cracking art (PX–134; PX–135). Its composition is covered in the claims of the '249 and '253 patents now in suit.

As soon as these revolutionary claims became public knowledge in the trade, the defendant Grace, the major producer of cracking catalysts in the world (Tr. 2733), was immediately alerted. The very next day its Vice-President notified the Chairman of its Board of Directors that the industry had been taken by complete surprise and that, if this new catalyst did what Mobile claimed, it would ruin their own catalyst business (PX–489; Tr. 2839). Grace immediately set out to evaluate Mobil's new product by procuring a sample (Tr. 2843), and then attempted to develop a fluid catalyst based on the Mobil techniques (PX–728, 108224).

Grace's efforts to copy Mobil were appreciably enhanced when the former's catalytic expert, Dr. Baker, procured a copy of Mobil's South African Patent (a counterpart to the '249 patent in the United States) which fully disclosed much of the basic Mobil technology (PX–124; PX–132; Tr. 1820). Grace

dymium, and samarium, which are grouped together in the periodic table of elements and

whose chemical properties are similar (Tr. 1947).

attempted to evaluate these newly disclosed methods and to duplicate them, but was unsuccessful (Tr. 2737). Having failed in this, they approached Mobil to explore the possibility that there might exist a mutuality of interest in the commercial field, since Grace's skills and technology lay primarily in the fluid field and Mobil's in the "bead form" or moving-bed field. Nothing ever materialized from these joint venture discussions and Grace then sought to negotiate a licensing-royalty arrangement (Tr. 2755), wherein Grace expressed a desire to license claims 9 and 11 of the '249 patent (PX–728, tab 17).

By November, 1965, Grace made preparations to produce its own commercial zeolite X catalyst (XZ–25), its Board of Directors appropriating and budgeting a substantial amount of corporate funds to construct a new plant. In so doing, it prepared preliminary cost estimates and the profit projections expected (PX–494–A) from such venture; and it priced its product to include the royalty rate being negotiated with Mobil. It was publicly acknowledged in the trade that the new product would be manufactured under a license from Mobil (PX–494, 107102). Representatives of Mobil and Grace orally concluded an agreement in December, 1965, based upon an agreed royalty of 12% (DX–TC), subject to the receipt of a draft agreement in which minor revisions might be made (Tr. 2874). However, in February, 1966, the Rabo patent issued relating to the use of the "Y" zeolite sieves in catalysts. Simultaneously with the happening of that event, Grace cooled on the pending agreement with Mobil and it was never executed. Grace concluded that the Mobil patent package was not as valuable as it had originally contemplated, because the Rabo patent

might possibly dominate the area in which they desired protection.

The '357 patent application was filed May 17, 1962, and was finally granted after a favorable decision of the Court of Customs and Patent Appeals, Application of Plank, 399 F.2d 241, 55 C.C.P.A. 1400 (1968), which reversed an original denial by the Patent Office. It has since been held valid also in Mobil Oil Corp. v. Filtrol Corp. & Texaco, Inc., No. 69–633F, June 24, 1971 (C.D.Calif.) (Tr. 4546). The real difference between the '357 patent and the '249 and '253 patents is that it incorporates the "Y" type zeolite. The chemical difference between these two synthetic zeolites is that in the "X" type zeolite the ratio of silica is two to three times that of alumina; while in the "Y" type the ratio is a minimum of three up to six parts silica to one part alumina. These differences may be ascertained both by chemical analysis and x-ray analysis (Smith Tr. 1212; PX–547, tables A–D).

The '357 teaches that the "Y" zeolite may be base-exchanged "substantially free of alkali metal" by treating it with the ions referred to therein either before or after, or both before and after, the admixture with the matrix. The resulting composite has an alkali metal content below 3% and, preferably, below 2% (Col. 4, lines 33–37). Thus the "Y" zeolite can tolerate more residual sodium than the "X" zeolite and it is more stable under comparable conditions. The manufacture of these composites is taught by claims 7, 9, 10, 17, 19, and 20 in '357. The commercial test results indicate a 20% increase in gasoline yield and a 65% reduction in coke (PX–618).

All three of these patented catalysts produced synergistic results.[12] The rare earth and rare earth hydrogen forms of the composite catalyst actually improved

---

12. Chemical synergistic action occurs where the effectiveness of two or more chemical materials is increased over the sum of the action of each such agent when used alone. When the crystalline aluminosilicate (zeolite component) is mixed in a matrix, not only does it tolerate higher levels of sodium, but in the

process there is believed to occur a chemical interaction between the sodium in the sieve and the matrix. It is postulated by Rosinski that the sodium comes out of the sieve and goes into the matrix, thus preventing the sieve from losing its activity (Tr. 599–600).

in activity and selectivity after being exposed to the heat and steam encountered in the oil cracking operations, whereas all prior catalysts decreased their activity and selectivity under similar conditions (Tr. 363–364; 503–508; 517–525). By incorporating the zeolite component into the silica-alumina matrix, the interaction of one with the other produced much greater catalytic activity of the zeolite component than when used separately. The composite catalyst achieved unexpected results (PX–738) both in its activity and yield and exceeded the performance of each when used separately. Furthermore, the octane rating of the gasoline produced was unexpectedly higher (Tr. 578–579).

It is also significant to note that the matrix had an effect upon the heat balance of the catalyst as it went through the cracking and regenerative system. During the cycle which burns off the coke, the zeolite would get hotter than the matrix, so that by its being in the matrix the heat balance protected it. During the cracking process itself, an endotherm reaction occurs wherein heat is absorbed and the heat from the matrix is sucked up in the process of thermal exchange so as to turn the material particles. The interrelationship between the matrix and crystalline aluminosilicate is more stable in the matrix and possesses greater activity (Tr. 599–601).

Grace advertised in 1968 in one of its trade brochures:

"The introduction of the Zeolite Catalysts some five years ago quickened the refiner's art and science by enabling him to get up to 'five quarts to the gallon' in high octane gasoline output. Perhaps even more significantly, these valuable catalysts allowed refiners to boost their product output significantly without new capital investment for expanded facilities.

"In effect, the advent of Zeolite Catalysts brought benefits and profits to the refinery that few of us could have imagined before 1960." (PX–738, tab 3).

Mobil promptly tested and commenced to produce commercially both the fluid forms and moving-bed forms of the newly developed catalyst. Texaco started using the fluid process in 1964 (Tr. 1860). In 1965, Mobil introduced the "Y" type moving-bed catalyst commercially under the tradename "Durabead 7" as beads and, in 1967, the D–9 fluid type powdered material was produced and marketed (PX–114).

Since 1961, Mobil has used 80,000 tons in its own cracking plants (Tr. 1850–1853) and has sold approximately 40,000 tons, (worth about 29 million dollars) to its customers (Tr. 1851, 1857). In addition to this, Mobil claims that Grace has sold 130,000 tons, worth more than 50 million dollars (Tr. 2341; PX–494A, p. S–4). Mobil has also licensed several other manufacturers such as American Cynamid, Nalco, and Houdry and granted a use license to Standard Oil of New Jersey (Esso). Cynamid and Nalco are both paying a royalty of 8.4% to Mobil (DX–TE; DX–SR; Tr. 2821, 2087–2088; 3064). By 1969, Grace publicly acknowledged that the market acceptance of the Mobil type catalyst was almost universal when it said:

"By 1969 approximately 85% of all refineries had converted to some kind of crystalline, molecular sieve-type catalyst." (PX–738, tab 5, 116622).

*Validity of the Patents*

■■ Patents lawfully issued by the United States Patent Office are by statute presumed to be valid,[13] and the burden of establishing invalidity rests on the party asserting it. The crucial test of patentability is whether or not the invention would have been "obvious" at the time it was made to a person having ordinary skill in the technology to which the invention relates.

In Graham v. John Deere Co., 383 U. S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545

13. 35 U.S.C. § 282.

(1966), the Supreme Court considered the public purpose served by the patent system, and emphasized that patents which fail to measure up to the requisite standard of patentable invention do not serve that purpose. 383 U.S. at 5–6, 86 S.Ct. 684. Congress has established a statutory standard of measure (35 U.S. C. § 103) to guide the determination of a patentable invention. It states in part:

> "A patent may not be obtained . . . if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains."

The proper approach to be taken in applying this "nonobviousness" criterion of the foregoing statute was explained by the Supreme Court in the Graham case, 383 U.S. at 17, 86 S.Ct. at 694, when the Court said:

> "While the ultimate question of patent validity is one of law, A. & P. Tea Co. v. Supermarket Corp., [340 U.S. 147 at 155, 71 S.Ct. 127, 95 L.Ed. 162] the § 103 condition, which is but one of three conditions, each of which must be satisfied, lends itself to several basic factual inquiries. Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined."

Thus, in determining patent validity, this Court must consider the prior status of the catalyst cracking art at the time of the inventions and determine whether the patents are simply a new assemblage of old elements. The Court of Appeals in this Circuit has made it clear that this "test should also apply to chemical compositions."

"If each such [chemical] combination, alleged to improve upon its predecessors, is to be patentable, and regarded as not the workaday product of those skilled in the art, the statute as interpreted by the Supreme Court in Graham v. John Deere Co. would, we think, be subverted, the definition of what constitutes invention would be greatly enlarged, and the public interest would suffer. . . .

. . . . . .

"Just what will be the exact proportions to supply the needs of particular products may require a large amount of experimentation. But this very experimentation is of the essence of the art involved in this lawsuit; it is on the level of ordinary skill in the art. This is all the more true because the practitioners of this art are, and of necessity must be highly educated, sophisticated persons who generally have at their disposal laboratory facilities and staffs of competent assistants.

. . . . . .

"We limit this ruling to the subject matter before us, as we must, but see no reason to doubt that the principles we have formulated may have a wider application, especially in the field of chemistry." Indiana General Corp. v. Krystinel Corporation, 421 F.2d 1023, 1030–1031 (2d Cir. 1970).

A patent can be just as fatally invalid for obviousness under § 103, as is a patent which is invalid for lack of novelty or anticipation under § 102. While the Patent Office may issue patents, because they are not squarely anticipated by the prior art, this is not the controlling standard in the courts. Carter-Wallace, Inc. v. Davis-Edwards Pharmacal Corp., 443 F.2d 867, 871, 872 (2d Cir. 1971).

However, this Court is not unmindful that where intricate questions of chemistry are involved; which are peculiarly within the particular competence of the Patent Office, the presumption of validity should be weighed with

226

great care. This is especially true where catalysts are involved, because of their known unpredictability under modified changes in their environmental use.

> "The catalytic action . . . can not be forecast by its chemical composition, for such action is not understood and is not known except by actual test." Corona Cord Tire Co. v. Dovan Chemical Corp., 276 U.S. 358, 368–369, 48 S.Ct. 380, 383, 72 L.Ed. 610 (1928).

The claims of the patents in suit are of three types: (1) claims to the new composite catalyst product ('249 claim 19; '253 claim 19; '357 claims 7, 9, 10 and 17); (2) claims to the method of manufacturing the catalyst product ('249 claim 1; '253 claims 23, 24, and 28; '357 claims 19 and 20); (3) claims to a process of gas oil cracking by means of a new catalyst ('249 claim 15; '253 claim 32). The claims expressed in the '249 patent[14] are basic; whereas, the '253 and '357 patents disclose improved and preferred commercial forms.

*Summary of Patented Prior Art*

The prior art considered and relied upon by the defendant included the following: (1) Thomas (DX–AA), teaches that the removal of alkali metal ions improves catalytic activity, without specifying minimal percentages in any given situation; (2) Ahlberg (DX–AB) teaches the removal of the aforesaid metal ions improves the stability of the inorganic oxide gel as a catalyst; (3) Pitzer (DX–AC) teaches that the addition of lanthanum oxide (a rare earth metal) to a silica-magnesia catalyst improves its stability; (4) Schwartz (DX–AE) relates to the removal of alkali metal ions from the oxide gels by base-exchange and teaches that the addition of finely divided materials to the oxide gel component, either catalytically active or inert, and of 1–5 microns in diameter, results in an improved attrition resistant catalyst and that such additives include cer-

ium oxide (a rare earth); (5) Cramer (DX–AF) teaches that the addition of finely divided alumina to the oxide gel improves diffusivity; (6) Milton (DX–AG) teaches methods of making zeolite "X", as a synthetic large pore crystalline aluminosilicate zeolite and ion exchanging the sodium with replacement ions (including rare earth) by conventional techniques; (7) Breck (DX–AH–1) relates to methods of making zeolite "Y," a large pore crystalline aluminosilicate, and teaches that it is more stable than zeolite "X"; (8) Milton and Breck (DX–AI) teach the use of synthetic large pore crystalline aluminosilicate zeolites as cracking catalysts, and that the removal of two-thirds of the sodium improves catalytic activity and selectivity; (9) Bourguet-Hart (DX–AK) relates to synthetic large pore aluminosilicates as cracking catalysts and teaches the removal of 75% of the original metal alkali with rare earth ions; (10)(a) Rabo (DX–AL–2 and DX–AM–2) relates entirely to catalysts made with pure zeolite "Y" impregnated with platinum or palladium but with no matrix; (b) Rabo (DX–AM–1) relates to the REHY (rare earth hydrogen Y) zeolite as a catalyst and teaches the removal of alkali metals by base-exchange with polyvalent metal ions improves activity; (c) Rabo (DX–AL–1) relates to the use of decationized zeolite "Y" molecular sieve; (11) Fleck (DX–AN) teaches the use of an acid treated natural clay with a faujasite or synthetic zeolite metallo alumino silicate, with the objective of absorbing the nitrogen impurities out of the feedstock.

Grace claims that the subject matter claims in the '249 patent were anticipated and were the logical outgrowth of the prior art and would have been obvious in the light thereof. Furthermore, that such differences as were shown to exist under the new patent claims were inconsequential. However, as early as 1948, Houdry, the pioneer commercial crack-

14. *See* Plaintiff's Exhibit 2, United States Patent No. 3,140,249, Claim 1 (Col. 23, lines 45–57); Claim 14 (Col. 25, lines 51–56); Claim 15 (Col. 25, lines 57–60); and Claim 19 (Col. 26, lines 29–49).

ing catalyst manufacturer, had used some synthetic zeolites then available. It found that both the sodium and acid ammonium forms were unstable and quite useless, (Tr. 227–288), and these facts were published (PX–102).

In 1957, Texaco in its patent No. 2,818,137 issued in 1957 (PX–365) warned the industry that while zeolites were useful for adsorption purposes, they would not tolerate thermal cracking regeneration temperatures (Tr. 3152–3154). Thus, as of January, 1957, a person of ordinary skill in the art would have expected such zeolites to decompose if subject to the severe temperature conditions encountered in commercial cracking units (Tr. 443–445). It was also common knowledge that, if zeolites were base-exchanged to the acid or ammonium form, they would "peptize" and become so small that they could not be effectively handled (Tr. 442–444; 2668–2671; (PX–140). Evidence of this is reflected in Fleck (DX–AN), where regeneration of the mixture of silica-alumina catalyst and zeolite adsorbent is carried out under controlled conditions of 2.5% air at temperatures ranging from 975–1050° Fahrenheit (Fleck Col. 5, lines 1–2). Kimberlin similarly carried out regeneration at the low temperature of 850° Fahrenheit (DX–AJ, Col. 6, lines 36–37). This temperature is impractical, however, for commercial use (Tr. 3186–3187).

Although Hart, Bourguet, Frabetti, Frilette and Weisz of Mobil did do research work on pure zeolites, their unpublished internal memoranda and notebook entries on pure zeolites is irrelevant to the issues here. The Hart-Bourguet patent application was not filed until October, 1960, while the patents in suit were all filed July 12, 1960. They did not do research on the zeolite containing *composite* catalysts, to which Dr. Plank and Rosinski addressed their efforts.

When Plank and Rosinski began their zeolite catalyst development on or about January 25, 1957 [15] (DX–BAW, 25357; PX–139; Tr. 2693), they were aware that Crystalline zeolites were chemically unstable and would disintegrate or decompose under normal commercial cracking conditions. They also were cognizant that such zeolites, which were then being made and sold, were physically impractical for catalytic cracking and use in commercial units because: (1) they were so fine in size that, if used alone, they would not stay in the unit, but would blow away; (2) they would form too much coke on their surface and burn up in the catalyst's regeneration; (3) they lacked attrition resistance, and; (4) they were too expensive for use alone in the tonnages required for commercial use (Rosinski Tr. 595–597).

It was under the circumstances of these negative teachings in the catalytic art, that on or about January 25, 1957, Plank and Rosinski first proceeded to explore the practicality of using crystalline zeolites in an amorphous catalytic matrix for purposes of gas oil cracking. The catalytic prior art of the Thomas (DX–AA), Ahlberg (DX–AB), Cramer (DX–AF), and Schwartz (DX–AE) inventions dealt with the amorphous silica-alumina catalysts which have since been rendered obsolete by Mobil's zeolite composite catalyst (Tr. 3146–3148); while Pitzer (DX–AC) related to the amorphous silica-magnesia catalyst, which never became commercially suc-

---

15. While the plaintiff claims that Dr. Plank's laboratory note book (*see* DX–BAW and PX–598 at p. 25341) indicates that the '249 patent was first conceived December 7, 1956, the Court finds that these notes referred to an isomerization catalyst, not a cracking catalyst (Tr. 2716). There is no reference to using base-exchange to replace sodium, no reference to ammonium or free hydrogen ions, and no reference to mixing a zeolite into a composite matrix (Tr. 2664, 2689).

The first note indicating the latter concept was on January 25, 1957 (at p. 25357), and that is the date accepted by the Court. Rosinski himself said that one skilled in the art of hydrocarbon conversion processes would not use an isomerization catalyst as a cracking catalyst (Tr. 1523). *See also* Plaintiff's Exhibit 140, laboratory note book of Dr. Plank, January 25, 1957; Tr. 2669–2672; PX–139; Tr. 2693–2695.

cessful (PX–537–B, Ex. 2). None of those patents cited above teaches or suggests the use of crystalline zeolites for cracking purposes. They were used during the period 1940–1962, and became obsolete after the plaintiff's '249 catalyst became commercially available (Tr. 3147).

■ The Court finds that the concept of the '249 invention was first initiated January 25, 1957, according to Dr. Plank's laboratory notebook (PX–598), and reduced to practice by mid-1957, when CP 3667 was made and tested and filed in the Patent Office on July 12, 1960. Therefore, the Rabo patent applications (DX–AL–2 and DX–AM–2), which were both filed on December 30, 1959, would not qualify as prior art under 35 U.S.C. § 102(e) (Tr. 1905–1908). Neither is the Hart-Bourguet patent (DX–AK) considered prior art, having been filed October 17, 1960, after the '249 was filed; and three years after it had been reduced to practice. Nor does it constitute prior art of the '253 and '357 patents, because both were reduced to practice in 1960, before the filing date of the Hart-Bourguet patent.

Milton (DX–AG), Breck (DX–AH–1 and AH–2), and Milton (DX–AI) all described large pore zeolites for use as adsorbents. None contained any teachings as to their use as gas oil cracking catalysts (Tr. 3149–3151; 1968–1980). The Milton patent (DX–AG) disclosed that at the time it was filed, December 24, 1953, large pore synthetic zeolites of the X-type were then known to the art and at that time, Y-type zeolites were being experimented with industrially. This tends to destroy, at least in part, the defendant's claim that the plaintiff's invention was the logical outgrowth and attributable to the discovery and commercial availability of zeolites X and Y. In other words, the defendant's claim was that the catalytic cracking art had then developed to the point that it was a natural sequence for the plaintiff to utilize and adapt to its use these zeolites for catalytic cracking, when they came upon the scene. Thus, at least from 1953 to January 1957, when Plank and Rosinski initiated their concept no one had yet discovered their possible use for such purposes as catalytic cracking.

### Kimberlin Patent

The Kimberlin patent (DX–AJ) was issued February 14, 1961, on an application filed February 5, 1957. It was cited and considered by the Patent Office Examiners before granting each of the patents in suit (Tr. 2076–2081). In the light of the Plank-Rosinski inventive conceptions having been initiated at least as early as January 25, 1957, Kimberlin might well be challenged as being prior art.

Kimberlin can be readily distinguished from the '249 patent in any event, in that it emphasizes: (1) that the crystalline zeolite should be used as the sole catalyst in the cracking zone, (col. 7, lines 5–8); (2) that crystalline materials adversely affect the catalytic performance of conventional amorphous catalysts; and (3) that the random size pore openings of conventional amorphous catalysts are undesirable. Furthermore, Kimberlin did not teach a technique for better gas oil cracking performance than the conventional silica-alumina; and it taught that as much as one-third of the original sodium should be retained in the zeolite for best results.

The Kimberlin patent taught that, previous to its own described invention, the prior acceptable procedures for preparing conversion catalysts indicated that a person of ordinary skill should not involve the use of crystalline material in the presence of an amorphous substance like silica-alumina or silica-magnesia. Such a teaching would run adversely to the concept of Plank and Rosinski. Kimberlin in column 1, lines 58–62, in referring to these prior catalysts, stated:

"By whatever means prepared, the final catalyst was amorphous and, indeed, if any crystalline material were present in the final product, hydrocarbon conversion was seriously ad-

versely affected and byproduct formation increased."

Kimberlin's claim 1 reaffirms this teaching, when it unequivocally describes its invention as:

"A process for upgrading hydrocarbons which comprises contacting a hydrocarbonaceous fluid in a conversion zone at elevated temperatures with a crystalline metallic alumino-silicate catalyst having uniform pore openings between about 6 and about 15 Angstrom units, said material being the sole conversion catalyst in said zone . . . ." (column 7, lines 5–8).

There is no mention of forming a composite catalyst in a matrix encompassing the crystalline material with the amorphous silica-alumina, in an oxide gel as described in the '249 invention.

Furthermore, Kimberlin's catalyst E, containing magnesium catalyst X, which had the highest catalytic activity and selectivity (column 6, lines 28–34), did in fact produce a 10% lesser yield in gasoline (44.5% D & L) than did the regular silica-alumina when used on the same feedstock, so as to yield 50% D & L. It also produced 20% more coke (an unwanted byproduct) than did the standardized silica-alumina by the same test. Thus Kimberlin's disclosure, indicating its gasoline yield results to be comparatively inferior to silica-alumina, did not encourage workers in the art to press forward with the use of zeolite for gas oil cracking until after Mobil's revolutionary public announcement in 1962.

Kimberlin's best catalyst E contained about 9% sodium. In column 6, lines 69–75, the patent states:

"Furthermore, catalysts 'C' and 'E' contain substantial amounts of residual soda, namely 12.7 and 9.2% $Na_2O$ respectively. Inasmuch as conventional gel type catalysts are acidic in nature and are poisoned by soda content above about 0.5% $Na_2O$, the highest cracking activity obtained with these catalysts is particularly surprising and unexpected." (Tr. 2107–2108, 3185).

This is consistent with Kimberlin's statement in column 4, lines 15–19, wherein he says:

". . . it is only necessary to replace about two-thirds of the soda with the other metal oxide. The removal of more soda than this does not bear too great an influence on the behavior of the crystals as catalysts."

Since Kimberlin's teachings in this respect ran contrary to the developments of Dr. Plank and Rosinski, Kimberlin's teaching could not have rendered their concept of a combination catalyst obvious to a person of ordinary skill in the art.

After this suit was commenced, Grace did procure a license under the Kimberlin-Esso patent (Tr. 2835), but only after Esso had used economic pressure by removing about 3 million dollars of its annual business from Grace and after threatening to send all of the remainder of its catalytic business elsewhere (Tr. 2889–2892, 2895A).

*Fleck Patent*

The Fleck patent (DX–AN) was filed December 14, 1956. This approximates the January 25, 1957 date when Dr. Plank and Rosinski first conceived their ideas embodied in the '249 patent. They claimed to have begun their pioneer work on their zeolite containing catalysts before the effective date of the Fleck patent, on or about December 10, 1957, but the Court finds that laboratory notes confirm the idea's conception on January 25, 1957. However, Fleck was really a paper patent and was never practiced commercially (Tr. 3177). The sodium zeolite X, sometimes referred to as 13–A (Tr. 3154–3155; 3159; 2162–2164), would have been destroyed, if it were subjected to the temperature and steam conditions encountered in commercial practice (Tr. 3160; PX–765, p. 9). Fleck teaches a very mild regeneration condition at a maximum temperature of 1050° Fahrenheit and in an atmosphere of 2.5% air concentration. If this procedure were followed in a commercial regenerator, it

would take forty of them to do the job of one (Tr. 3161).

Fleck's primary declared objective was to absorb organic nitrogen compounds out of the gas oil, which were contaminating the hydrocarbon cracking process. In doing this he found the sodium form of zeolite X suitable for his purposes. Grace urges that Fleck was referring to the calcium-exchanged form of zeolite X, when he stated in column 5, lines 12–13, "Substantially identical results were obtained using a synthetic metallo alumino-silicate having 10A pores." From this supposition, Grace postulates that Fleck must have been referring to mixtures of his silica-alumina catalyst with a lower sodium zeolite and thereby may have inadvertently made and used a composite catalyst similar to what is claimed and described in the '249 patent.

The factual ambiguity of the quotation to the effect that the 10A pore zeolite of Fleck gave results substantially identical to the 13A sodium zeolite created speculation and guesswork (Tr. 3176) as to its intended meaning, because the symbols 10A and 13X were often synonymously used in the commercial market when describing that form of catalyst (PX–775–C; Turkevich Tr. 2164). It is clear, however, that no specific test example is demonstrated in the patent to disclose the tests alluded to. Therefore, it should bear little or no weight to prove a prior art disclosure, which might possibly suggest the inventions of Dr. Plank and Rosinski.

■ A document so obscure in its terminology that two conflicting theories might be deduced therefrom is too indefinite to be utilized as a reference. Lever Brothers Co. v. Proctor & Gamble Mfg. Co., 139 F.2d 633, 641 (4th Cir. 1943); Badische Anilin & Soda Fabrik v. Kalle & Co., 104 F. 802, 808–809 (2d Cir. 1900).

Fleck's patent made no mention of the concept of a sodium free matrix as such (Tr. 2144); nor did he specify any specific amount of sodium which the silica-

alumina gel would tolerate. Dr. Turkevich, a defense witness, strained at the suggestion in Claim 2 of the patent, where it recites that the molecular sieve zeolite absorbent comprised between about 1% and 50% by weight, and suggested that if one took the minimum of 1% 13–X zeolite and clay, it could conceivably have a total sodium content of less than one weight percent.

Fleck contained no specific teaching of base-exchanging his mixtures, within the teachings of the '249 patent, to provide for a pre-exchange or post exchange of cations to replace the sodium in the crystalline aluminosilicate (Tr. 339–343; PX 750, p. 4). Dr. Turkevich suggested that if one were to acid-wash the clay, as stated in Fleck, by implication it should result in a removal of substantially all of the sodium present and thus provide a sodium free matrix (Tr. 2144). He did concede that some of the clays used by Fleck contained as high as 2.68 weight percent of sodium oxide themselves, without considering the additional sodium in the synthetic silica-alumina gels referred to in the Fleck patent.

■ Fleck's patent did not describe his catalytic compositions as containing a sodium content of less than 1 weight percent, as taught by claims 1, 15, and 19 in the '249 patent in suit; nor did he describe a substantially sodium-free zeolite component as required by claim 19 thereof. These voids or uncertainties cannot be read into Fleck by implication. To be classified as anticipated prior art the elements must be disclosed with specificity and adequate directions within the patent to constitute anticipation.

"No doctrine of the patent law is better established than that a prior patent or other publication to be an anticipation must bear within its four corners adequate directions for the practice of the patent invalidated. If the earlier disclosure offers no more than a starting point for further experiments, if its teaching will sometimes succeed and sometimes fail, if it

does not inform the art without more how to practice the new invention, it has not correspondingly enriched the store of common knowledge, and it is not an anticipation." Dewey & Almy Chemical Co. v. Mimex Co., 124 F.2d 986, 989 (2d Cir. 1942).

*Also see*: Ling-Temco-Vought, Inc. v. Kollsman Instrument Co., 372 F.2d 263, 267 (2d Cir. 1967); Walker v. General Motors Corp., 362 F.2d 56, 58 (9th Cir. 1966).

■ The '249 patent disclosures demonstrate that it will produce 20% plus more gasoline and much less dry gas and coke than the prior art amorphous silica-alumina catalysts at the same conversion level.[16] Fleck does not report that his compositions are capable of producing even 1% more gasoline than the amorphous silica-alumina on any feedstock gas oil at the same conversion level. Furthermore, he discloses no data on the yield of dry gas or coke. (Tr. 2187–2188). The absence of such important disclosures inferentially indicate that such achievements were not obtained. Fleck does not disclose any prior art which would render the '249 patent obvious. United States v. Adams, 383 U.S. 39, 86 S.Ct. 708, 15 L.Ed. 2d 572 (1966).

■ Neither does Fleck make obvious the '253 patent. The latter is a composite catalyst consisting of a matrix and a zeolite component, which contain rare earth and hydrogen (ammonium) percursor ions. Fleck makes no specific mention of rare earth or the use of am-

monium cations; nor does it teach base-exchange with such ions (Tr. 2140–2145). The only reference in Fleck to such is in column 4, lines 3–4, where it states, ". . . other desired metal ions may then be introduced by ion exchange." Dr. Turkevich suggests that ammonium is part of the overall ion exchange art. However, there is no specific teaching concerning the introduction of the hydrogen or hydrogen percursor ions. It must be concluded therefore, that the '253 invention is also not obvious over Fleck, for the same reasons which are applicable to the '249 invention.

■ Fleck is entirely irrelevant to the '357 patent. The latter describes a composite of a matrix and a "Y-type zeolite," while Fleck makes no mention of the Y zeolite. Grace's technical director of Petroleum Chemicals conceded that the Y zeolite containing composite required much less of the very expensive zeolite component compared with the use of the X zeolite (Tr. 2409–2410) and gives an unexpected superior performance. The '357 patent is also not rendered obvious over Fleck, for the prior reasons, which are applicable to the '253 and '249 patents.

### Patents Inadequately Defined

■ As an affirmative defense, Grace asserted that the patents in suit failed to meet the statutory criteria for a patent, as set forth in the definitive requirements of 35 U.S.C. § 112.[17] It claims that some claims of the patents

---

16. "The conversion is the cracking of the gas oil to products boiling below the end point of gasoline. That is, gasoline in this case would be about 410 gasoline." (Rosinski Tr. 835). *Also see*, PX–2 (Example 3, cols. 12–13, lines 25–42 and Tables I and II).

17. 35 U.S.C. § 112 provides:
"The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode con-

templated by the inventor of carrying out his invention.

"The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention.

"An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof."

are so broad that they cover compositions which are inoperative as cracking catalysts, and that no techniques were available in 1960 to determine the structure of the zeolite or the cations associated with them in the patented catalysts. The defendant claimed that in the absence of a technique to determine the cation associated with the zeolite, one could not tell by reading the patents whether or not he was infringing (Tr. 2611, 2628).

On the issue of whether or not the structure and cation content of the zeolite component of the patented catalysts was accurately determinable in 1960, the plaintiff offered the testimony of Dr. Smith, a professor who taught Mineralogy at the University of Chicago, and Dr. Olson, a specialist in X-ray diffraction studies of crystalline zeolite. X-ray diffraction analysis is used to identify the chemical constituents in a mixture of substances. It acts like a fingerprint for the elements in the materials which are under study. This technique has been recognized by scientists as a tool for identifying materials for at least 60 years (Tr. 1189).

The technique involved the use of a sample material mounted in a holder and polished so as to give a flat surface. It was then inserted into a vacuum and bombarded by an electron beam. This electron beam is designed to hit the surface and penetrate a small distance, approximately one micron. In so doing it generates X-rays which escape from the sample and are picked up by counters which record the energy of the X-ray and tell what type of chemical atom has been bombarded. Dr. Smith explained that he had used it consistently as early as 1951 and that in 1960 procedures existed for determining the identity of the cations associated with the zeolite component of the claimed composite catalysts (Tr. 1233-34). He testified that, as early as 1960, he had personally purchased an electron microprobe which could ascertain whether or not a zeolite component in a composite catalyst contained rare earth (Tr. 1238).

Dr. Smith explained that these crystalline zeolites have miniscule pore openings or windows, which lead into the pore cavities, so that the diameter of the pore has a greater diameter than the diameter of the pore window or entrance opening. When the range of Angstrom measurement is used in describing the patent, it has reference to the pore opening entrance, which affords a kind of screen or sifting effect determining the size of gas oil molecules which may enter into the pore cavity or room. It is possible successfully to measure the size of these pore openings in Angstrom measurements by using the X-ray diffraction reference standards (Tr. 1255–1263). This measurement may be particularized down to one-tenth of an Angstrom in the dehydrated form (Tr. 1294, 1304). However, there can be a variable of 0.2 Angstroms in the hydrated form due to the constant ion exchange activity (Tr. 1305; PX–388), at the pore entrance. Thus, the modification of the pore opening entrance might vary for a ten millionth of a second (Tr. 1393). It was explained that the surface area within these pores could also be suitably measured by the Brunnaur, Emmett, and Teller (B.E.T.) method of nitrogen adsorption (Tr. 1625). Dr. Olson explained that in 1960, X-ray diffraction procedures and equipment did exist, which could determine the structural characteristics of the crystalline zeolite component of the patented catalysts (1710–1711). The Court finds from the evidence that adequate scientific methods of identification and measurement of the zeolite internal structure and cation content of the zeolite component of the patented catalysts did exist in July 1960, when the plaintiff's earliest patents were filed.

Grace's allegations that the claims of the patents were overly broad has not been persuasively supported by tangible evidence. Grace's chemists had no difficulty in copying Mobil's South African Patent in 1962 and making and testing the new composite zeolite cracking cata-

lysts described therein (Tr. 2272; 2277; 2377–2380; 262–264).

## Validity

In considering the question of patent validity in respect to the '249 basic patent, the issue is whether or not the new composite catalyst would have been obvious to a chemist skilled in the art of catalytic cracking at the time Dr. Plank and Rosinski made their invention. In other words, whether this hydrocarbon conversion catalyst in the form of a composite catalyst, having a zeolite component of large pores (6–15 Angstroms), mixed together with the conventional amorphous silica-alumina, so as to have a sodium content of less than 1% and which would produce in increased gasoline yield in excess of 20% would have been a logical outgrowth of the prior art.

The defendant Grace argues that Plank and Rosinski concede that they did not originate the broad concept of base-exchanging pure zeolites with both metal ions and ammonium ions to make them useful for catalytic cracking (Tr. 707–714). This concept was readily credited to Frilette and Weisz, but limited only to experimentation with the pure zeolite as against the composite which Plank and Rosinski was developing (Tr. 1574). Rosinski agreed that Bourguet and Hart at Mobil had base-exchanged pure large-pore zeolites with rare earth ions for catalytic cracking purposes before he and Dr. Plank had done work on rare earth exchanged zeolite X. However, Rosinski did point out that he and Dr. Plank had previous to that time done base-exchange research with rare earth ions or the combination of the crystalline material in the matrix (Tr. 726–729). Grace represents that the techniques used by Mobil's inventors in mixing the composite catalyst was similar to Mobil's Schwartz patent (Tr. 730–737), and that the low sodium aspect of the invention was nothing new. Grace also contended that the calcium acid zeolite component alone, produced more gasoline than the composite cata-lyst consisting of a calcium acid zeolite in a matrix (Tr. 1045–1046), and that there was little left for Dr. Plank and Rosinski to invent by way of original contributions. In this respect, it should be noted as hereinbefore stated, that the zeolite standing alone could not withstand the commercial thermal temperature required or the long time exposure to steam and was not thus physically functional for any commercial cracking use.

The Court finds that the three patents in suit are valid, and that all of their claims in issue in this litigation are valid and enforceable. All relevant prior art was considered and cited by the Patent Office at the time each of these patents were issued. The '357 patent originally issued only after a decision by the Court of Patent Appeals, Application of Plank, 399 F.2d 241, 55 C.C.P.A. 1400 (1968); and this latter decision was again reinforced when it was found valid in Mobil Oil Corp. v. Filtrol Corp. and Texaco Inc., No. 69–633F, June 24, 1971 (D.Calif.1971) (Tr. 4546), now on appeal. The '249 patent is merely the parental predecessor of the '357 patent. It teaches the basic concept of a composite crystalline zeolite in a matrix or gel binder, with the composite having a low sodium content. The '253 patent adds to the basic concepts of the '249 by teaching that particularly outstanding results are achieved when the zeolite in the catalytic composite, as prepared, contains both rare earths and ammonium cations, so as to provide a strongly acidic character to the composition in the matrix. The '249 and '253 were issued together on July 7, 1964, while the '357 was issued April 1, 1969, with a consent disclaimer of term beyond that of the '249 and '253.

Since the three patents were lawfully issued by the United States Patent Office, by statute they are presumed to be valid.

"A patent shall be presumed valid. The burden of establishing invalidity of a patent shall rest on a party asserting it." 35 U.S.C. § 282.

At the time Dr. Plank and Rosinski conceived the '249 patent, no researcher dreamed that a new catalyst might be created, which would industrially increase gasoline yield more than 20% from the same volume of gas oil and reduce the amount of coke byproduct by 60%. For almost a quarter of a century, scientists specializing in this catalytic research field had been exploring and testing thousands of ideas that proved fruitless. When the Mobil Durabead-5 catalyst and its cracking results were first announced in March 1962, the industry was amazed and taken by surprise (PX 728, tab 2). The defendant Grace's own expert at this trial, Dr. Turkevich, a professor of Chemistry at Princeton, was then a consultant chemical scientist for the M. W. Kellogg Company, refused to believe the results of the tests in which the new Mobil composite zeolite catalyst was used and he even questioned their analytical procedures (Tr. 3138–3139). Dr. Heinemann, himself the inventor of 45 catalytic patents, was then the director of chemical engineering research for Kellogg. He admitted that he too was skeptical at the time, because he had tested zeolites as catalysts and they did not perform well for reasons which we understand today, but did not understand then. After contract testing for Mobil at Kellogg's pilot plant from March until June 1962, he concluded that "this was the most revolutionary development that had occurred in a decade or two of gas oil cracking." (Tr. 3137, 3138). He was so enthused, he went before the Kellogg Executive Committee, which was composed of the senior officers of the company and the President and Chairman of the Board of Directors of Pullman, Incorporated (parent company of Kellogg), and urged them to negotiate a joint venture contract with Mobil, because he was convinced that this invention presented a major breakthrough in the industry (Tr. 3139).

The defendant Grace was uniquely situated during the 1950's to make the inventions of the patents here in issue. They were in the business of manufacturing and selling: (1) large pore zeolites (Blazek Tr. 2264, 2373); (2) rare earths (Tr. 2266, 2373), and; (3) amorphous silica-alumina catalysts (Tr. 2250–2251). These were the principal elements, which Dr. Plank and Rosinski used to create their revolutionary new catalysts. Grace, though its "Davison Division," was also the world's major supplier of gas oil cracking catalysts (Tr. 2733–2734), and carried out research to improve such catalysts throughout the entire period from 1955–1962 (Tr. 241–244; DX–BAQ–1, pp. 12–17). Grace also had in its employ a staff of scientists having more than ordinary skill in the gas oil cracking art, including Drs. Ciapetta, Baker, and Dobres (Tr. 2374–2375). Furthermore, any patent relating to a new cracking catalyst issued anywhere in the world was immediately brought to the attention of Grace's highly qualified catalytic scientists (Tr. 2735–2736; 2840–2841). Thus, Grace's scientists were kept currently knowledgeable of all the prior art on cracking catalysts.

The evidence discloses that Grace's scientists had actual knowledge as early as 1955, that base-exchanged forms of large pore zeolites X had some cracking activity (DX–BAQ–1, pp. 29–32, 37; DX–BAC, p. 1393), and also had actual knowledge by at least July, 1960, of Rabo's experiments with base-exchanged forms of large pore zeolite Y, indicating that they possessed isomerization activity (DX–BAQ–1, pp. 39–42; PX–593). Notwithstanding the foregoing circumstances, Grace's manager conceded that in 1962, neither the composition nor the performance achievements of Mobil's Durabead-5 was obvious to Grace's highly qualified catalyst scientists (Tr. 2374–2375). The foregoing experience of Grace tends to destroy the latter's claim that, as soon as large pore synthetic zeolites became available in 1955, this patented composite catalyst, which produced 20% plus more gasoline and

was worth at least a million dollars a day to the industry (Tr. 253–254), was obvious.

"Since experts of extraordinary skill failed to solve the problem, which was solved by the invention of the patent in suit, although said problem had confronted such persons for a number of years prior to [the] invention, the solution of such problems would not have been obvious at the time the invention was made to a person having ordinary skill in that art. United States v. Adams." Reeves Instrument Corp. v. Beckman Instruments, Inc., 161 U.S.P.Q. 450, 480 (C.D.Calif. 1968), aff'd, 444 F.2d 263 (9th Cir.), cert. denied, 404 U.S. 951, 92 S.Ct. 283, 30 L.Ed.2d 268 (1971); Lyon v. Bausch & Lomb Optical Co., 224 F.2d 530, 535 (2d Cir. 1955), cert. denied, 350 U.S. 911, 76 S.Ct. 193, 100 L.Ed. 799 (1955).

■ The fact that the solution to the problem solved by Dr. Plank and Rosinski had baffled workers of extraordinary skill in the catalytic art for many years, but, when revealed, was immediately and extensively adopted, establishes the existence of patentable invention worthy of protection by the courts under the patent laws.

"When the prolonged efforts of experts fail to produce the remedy desired, the discovery of the needed improvement and commercial success justify the conclusion that there is invention . . . .

". . . we consider that the failure of competitors to solve the problem . . . and the rapid replacement . . . of earlier processes in the industry is also strong evidence of invention." National Latex Products Co. v. Sun Rubber Company, 274 F.2d 224, 240, 241 (2d Cir. 1959).

Also see, Rich v. Mitchell Foods, Inc., 357 F.2d 176, 181 (2d Cir. 1966); White v. Fafnir Bearing Company, 389 F.2d 750 (2d Cir. 1968).

■ The wholesale adoption by the petroleum industry of the inventions in suit was the result of their extraordinary achievements in the commercial world of petroleum refining. The commercial use of these developments has already resulted in estimated savings in crude oil, reduced capital plant investment, and refining operating costs to the industry of approximately 2 billion dollars in the United States alone. Such worthwhile inventions are worthy of patent protection in that they encourage initiative, perseverance, and substantial commercial investment in research for a more abundant life. United States v. Adams, 383 U.S. 39, 47–51, 86 S.Ct. 708, 15 L.Ed.2d 572 (1966); Graver Tank & Mfg. Co. v. Linde Air Products Co., 339 U.S. 271, 274, 69 S.Ct. 535, 93 L.Ed. 672 (1949).

The crux of the issue is whether or not it would have been obvious, at the time these inventions were made, to put together in a composite catalyst, a silica-alumina conventional catalyst along with a crystalline zeolite component having these large pores, mix them together in a matrix, and come up with a low sodium content.

While the defendant now argues, in retrospect and with the benefit of hindsight, that an analysis of the prior art indicates that the puzzle might have been put together, had the right parts only been placed in proper position, the problem was not one of putting together a specific chemical substance. Rather, the problem was to create a catalyst which was not only both stable and economically renewable, but which possessed special physical and chemical properties that would cause gas oil molecules to break down into substances which could be readily separated by known physical distillation processes.

■ There is an inherent mystery surrounding the unpredictability of the performance of catalysts, a mystery which is generally recognized and acknowledged by chemists in the cracking art. This is one more reason why the presumption of patent validity "should not be disregarded especially in a case

of this sort where the intricate questions of . . . chemistry involved are peculiarly within the particular competence of the experts of the patent office." Merck & Co. v. Olin Mathieson Chemical Corp., 253 F.2d 156, 164 (4th Cir. 1958).

"The catalytic action . . . can not be forecast by its chemical composition, for such action is not understood and is not known except by actual test." Corona Cord Tire Co. v. Dovan Chemical Corp., 276 U.S. 358, 368–369, 48 S.Ct. 380, 383, 72 L.Ed. 610 (1928).

*Also see*, Application of Grant, 304 F.2d 676, 679, 49 C.C.P.A. 1215 (1962); Rich Products Corp. v. Mitchell Foods, Inc., 357 F.2d 176, 181 (2d Cir. 1966), cert. denied, 385 U.S. 821, 87 S.Ct. 46, 17 L. Ed.2d 58 (1966); Ling-Temco-Vought, Inc. v. Kollsman Instrument Corp., 372 F.2d 263, 268 (2d Cir. 1967); Georgia-Pacific Corp. v. United States Plywood Corp., 258 F.2d 124, 132–133 (2d Cir. 1958).

Although all of the individual elements of the patented synergistic combinations may have long been known and available individually prior to Dr. Plank and Rosinski, no one possessed the genius to create the patented inventions, despite the urgent and longfelt need for better cracking catalysts. United States v. Adams, *supra*; National Latex Products Co. v. Sun Rubber Co., *supra*. None of the alleged prior art suggests that the claimed composite catalysts, their claimed method of manufacture, how to obtain their performance achievements, or the differences between each item of prior art and the subject matter defined by the claims in suit would have been obvious to a person having ordinary skill in the art at the time the inventions were made.

The inventions disclosed and claimed in the '249, '253 and '357 patents differ structurally, functionally, and chemically from the prior art, taken alone or in combination. These differences are responsible for the unexpected performance, achievements, and synergistic qualities of the inventions in suit, compared to the materials of the prior art. Neither such differences nor the unexpected performance achievements or synergesims of the claimed inventions were rendered obvious by the prior art, taken alone or in combination. The entire petroleum industry followed Mobil's lead in 1962 and converted to the patented zeolites at such a rapid rate that, by 1969, 85% of all gas oil cracking was being carried out by means of their use.

### Unclean Hands Defense

Grace alleges that if the patents in suit are declared valid, they should be found to be unenforceable, because of Mobil's attorneys' lack of candor during the prosection of the applications in the United States Patent Office. Grace claims that Mobil's counsel deliberately misled the examiner with respect to the teachings of the Fleck prior art patent and took unfair advantage of a misunderstanding by the Patent Examiner of those teachings.

The basis of this claim is that the examiner initially rejected all claims filed in the '249 application as being "unpatentable over Fleck." In making the rejection, the examiner noted, "Fleck et al disclosed [Column 4 line 3 to 13] that the zeolite [zeolite X in the sodium form] can be ion exchanged" (Tr. 2635). On October 18, 1961, an amendment was filed conceding the Fleck reference, but representing that "All of the experimental work reported by Fleck et al involved use of such sodium aluminosilicate" (Tr. 2493).

Grace claims this latter statement did not conform to the facts, because while Fleck did recite the preparation, testing, and results achieved with two composite catalysts containing the sodium form of zeolite X (13A) and clay, it also referred to results using zeolite X in ion exchanged form. That part of the patent referred to states:

"Substantially identical results were obtained using a synthetic metallo alu-

mino silicate having 10A pores." (DX–AN, col. 5, lines 12–14; Tr. 2495).

Grace represents that Fleck really intended the term 10A pores to be a reference to an "X-zeolite" in which the sodium ions had been replaced by other ions, and that Mobil's attorney knew this at the time he filed his amended application. The defendant also claims that Mobil in prior litigation against Filtrol and Texaco represented to the Court that Fleck disclosed both the "sodium X" and "calcium X" type zeolites and is not now in a position to contend that the reference to "10A" in the Fleck patent is not a reference to a calcium-exchanged zeolite.

Mobil's Attorney Barclay testified that his posture was based on the fact that the Fleck patent presented no substantial experimental data to support the meaning of the 10A pore reference and that if any significant results had been obtained by Fleck, the experiment should have been specifically set out. The only experimental work actually reported involved the use of the sodium form of aluminosilicates; the 10 Angstrom pore material was simply alluded to.

The evidence disclosed that a serious confusion or ambiguity existed in the zeolite commercial trade between the symbols 13X and 10X as against the symbol 10A. The 13X sodium aluminosilicate material was a tradename of the Linde Corporation (a subsidiary of Union Carbide); while the 10X was sometimes used to represent the same material base exchanged with calcium. On the other hand, the "A" symbol itself was generally used to disclose an Angstrom size measurement of the external pores of the zeolite material being referred to, of which there were numerous classifications involving multiple different elements. In fact, as disclosed in the Seubold patent (DX–BAG), the 10A symbol and the 10X symbol were used interchangeably to identify a 10A sized pore, but Seubold contained 3.5 weight percent sodium content (Tr. 2575–2578; DX–C file history, p. 76; also Tr. 2585–2590).

Professor Turkevich claimed that the symbols 10A and 10X were the same and were used interchangeably. However, when he was shown (PX–581) describing the Grace-Davison molecular sieve 10A, as meaning the same as a 13X sodium zeolite, with the identical chemical content formula, he became more uncertain and indefinite. When pressed further on this point, he conceded that there was no statement in Fleck to indicate that "a synthetic metallo-aluminosilicate having 10A pores" described in column 5, lines 12 to 13, was in fact a 10X type zeolite sieve. (Tr. 2153–2154). He explained that in his own published article (PX–759), which reported the "calcium X zeolite" as containing 9.08 sodium oxide, with 10A pores, he was simply translating the experimental data of the Russian Scientist Topchieva; and in so doing, he was not vouching for the article's scientific validity (Tr. 2155–2158). It is apparent that there existed considerable ambiguity, vagueness, and conjecture in the loose use of 13X, 10X and 10A type zeolites in the trade. Grace concedes that Mobil's counsel properly acknowledged in the record to the examiner that Fleck did teach base-exchange. But Fleck's teaching was primarily addressed to the molecular sieve acting as an adsorbent to remove nitrogen compounds from the feedstock. The adsorbent was the molecular sieve and the silica-alumina amorphous gel or acid treated clay was the cracking catalyst (Tr. 2593–2594). The examiner, for some unexplained reason, found that Fleck "does not disclose the feature of base-exchanging the molecular sieve zeolite to remove the sodium ions present in the zeolite" (Tr. 2637–2639). Absent convincing proof of a deliberate fraudulent representation by counsel with the purpose of deceiving the examiner, and in light of the nebulous and indefinite teachings of Fleck on this point, the Court does not find that any willful fraud was committed on the Patent Office by Mobil's attorneys.

Grace alleges that after Mobil had received approval of the allowance of the '249 application, it decided to amend certain claims, including No. 15 and No. 19 in suit, by adding to them the limitation that the zeolite ingredient had "a structure of rigid three dimensional networks characterized by uniform pores . . . ." In its memoranda of April 7, 1964 (D–XV), Mobil stated that the reason for the amendment was to distinguish over "prior art, in which natural clays were distributed in an inorganic oxide matrix" (Tr. 2518, 2605). Grace claims that the use of clay was exemplified in the prior art in the Schwartz patent, and asserts that Mobil improperly failed to call the examiner's attention to this Schwartz patent (D–AE) of which it was the assignee, even though it might not have made any ultimate difference in the result.

The record discloses that the '249 patent (at Col. 2, lines 55 through Col. 3, line 29) pointed out how inorganic oxide amorphous gels had previously been prepared and quoted in substance from the Schwartz teachings, thus acknowledging indirectly the existence of prior procedures. Moreover, Schwartz dealt exclusively with prior art amorphous (non-crystalline) catalysts rendered obsolete by the zeolite catalysts of the '249 patent and was totally irrelevant to the '249 invention. There was no cause to cite Schwartz under such circumstances.

Grace alleges that Mobil did not exercise candor with the Patent Office in pursuing the '357 patent. The Patent Examiner and the Patent Office Board of Appeals had originally turned down the application. A successful appeal was subsequently filed in the United States Court of Customs and Patent Appeals and the '357 patent was allowed. 399 F.2d 241 (1968).

The defendant claims that prior to Mobil's taking that appeal to the Court, an inter-company memorandum indicated that its counsel had first recommended against the appeal, because of the recent issuance of the Rabo-Carbide patents Nos. 3,236,761 and 3,236,732 filed December 30, 1959. Grace argues that neither of the Rabo-Carbide patents referred to in the aforesaid memorandum nor either of the patent applications, Serial No. 862,989 (DX–AL–2) and Serial No. 862,990 (DX–AM–2), was brought to the attention of the Patent Office (Tr. 2528), and that Mobil has not explained why this highly pertinent art was not brought to their attention.

Grace claims that during Mobil's prosecution of the '357 patent application, Mobil failed to advise them that the superior characteristics of the Y-containing composite catalyst over zeolite X-containing composite catalysts were present in the pure zeolite components alone (Tr. 954–955). Grace now claims that if the omitted data had been included, Mobil could not have successfully told the Patent Office that the zeolite Y composite catalyst "has unexpectedly been found to have a greater activity and an improved selectivity over comparable catalysts prepared for other synthetic aluminosilicates such as those of the X-type zeolite."

Mobil's counsel Barclay, who prepared the application, testified that he originally believed that the filing date of the Rabo '761 and '762 patents was on February 7, 1962. However, subsequently he learned that the parent[18] applications, (DX–AL–2 and DX–AM–2), bore an original filing date of December, 1959, and that they did not contain the same broad disclosure as the '761 and '762 continuation patents subsequently filed in 1962. It was then that he realized for the first time that the effective filing date for the new material disclosed in the '761 and the '762 patents,

18. A procedure exists for the filing of so-called continuations or partial continuations, the continuation being an identical disclosure and the partial continuation being a disclosure together with added new matter. The original application from which the continuation applications are derived is called the "parent" application.

in respect to catalytic cracking, took legal effect only from February 7, 1962, and did not commence in December, 1959. He also knew that Dr. Plank's and Rosinski's invention of the '357 patent for a cracking catalyst had occurred prior to the latter date. It was under those circumstances that the decision to appeal to the Court of Customs and Patent Appeals was made (Tr. 2540–2541). Counsel testified that this appeal was based and submitted upon the record originally made at the Patent Office. 35 U.S.C. § 144 (Tr. 2541–2545).

 The Court finds that Grace's assertion that the plaintiff committed an act of bad faith in having failed to call the abandoned Rabo applications, (DX–AL–2 and DX–AM–2), to the attention of the Patent Office during prosecution of the '357 patent, is without merit. The Rabo patent No. 3,130,006 (PX–744) was in fact cited as a reference against the '357 patent by the Patent Office (Barclay Tr. 2540–2546), and the abandoned Rabo applications were in fact less relevant prior art than the Rabo '006 patent which was actually cited (Kirkbride Tr. 3198–3199). The Rabo '006 patent cited against the '357 expressly incorporated by reference the Rabo application (DX–AL–2), (Barclay Tr. 2543, 2546, 2622, 2623), and therefore was actually before the Patent Office for comparison. The examiner handling the '357 application was contemporaneously processing the two Rabo applications (DX–AL–2 and DX–AM–2); and it is only reasonable to conclude that he must have in fact been fully familiar with all of the Rabo applications (Barclay Tr. 2622, 2625, 2653–2654; PX–766; PX–767; PX–776).

 With respect to Mobil's alleged concealment from the Patent Office of the superiority of the Y zeolite alone over the X zeolite alone, it should be emphasized that the '357 patent was directed toward making improvements by using a "Y-zeolite" in a matrix over an "X-zeolite" in a matrix. This phase of its claim is supported in Defendant's Exhibit DS, p. 6, which says:

"Catalytic data presented in Table 3 show that Example 8 containing 10% Na/Al/Si 13Y is near as active as the pure material even though steam treated much more severely. [see table 1]. This demonstrates that the incorporation of 13Y into a Si/Al matrix followed by NH, Cl BX (Example 8) leads to increased stability of acid high silica aluminosilicates."

Grace's own witness conceded that the Y zeolite in a matrix is much more effective than X zeolite in a matrix and will tolerate more sodium in the composite (Tr. 2409–2410; 267–268). None of Grace's products contain the Y zeolite alone as a catalyst; they all contain a matrix (PX–684; PX–686).

The Patent Examiner handling the matter was a specialist. He dealt especially in hydrocarbons, conversion reactions, and catalysts related to that subject matter (Tr. 2602). His assignment included Class 208 and Class 252; the former dealt with processes for catalytic cracking and the latter category, the composition of such materials (Tr. 2609). Had the examiner considered the information of significance, he could have requested it. The record makes no claim that he did so and was falsely advised. The Court finds that no concealment amounting to a deliberate fraud on the Patent Office was perpetrated.

### Evaluation of Prior Art

Defendant Grace has set out the historical development and progress of the prior art and claims, in effect, that the patents in suit were obvious and unworthy of patent validity. Grace represents that this Court should find them to be invalid under 35 U.S.C. §§ 103 and 102, because of obviousness and lack of novelty. It asserts that Dr. Plank and Rosinski are presumed by law to have been aware of the prior art patents, which establish Grace's claims of obviousness, and that all of the patented features were actually established in the art, inconsequential, or logical outgrowths of the prior art.

The patents cited by Grace include: (1) Thomas (D–AA 1943); (2) Ahlberg-Thomas (D–AB 1939); (3) Pitzer (D–AC 1939–41); (4) Schwartz (D–AE app. 1954 issued 1959); (5) Cramer-Hauser (DX–AF filed September 15, 1958, issued September 6, 1960); (6) Milton (D–AG, app. 1953 issued 1959); (7) Breck (D–AH–1, app. 1958 issued 1964); (8) Kimberlin-Esso (D–AJ, app. Feb. 5, 1957, issued 1961); (9) Bourguet-Hart (D–AK, app. 1960 issued 1965, assigned to plaintiff); (10) Rabo (Carbide) serial No. 862,990, (D–AM–2, app. December 30, 1959, parent application of Rabo D–AM–1, patent No. 3,236,762 issued 1966); (11) Rabo, serial No. 862,-989 (D–AL–2 app. December 30, 1959, parent application of Rabo patent No. 3,236,721, D–AL–1 issued in 1966). The latter adds to D–AM–2 information relating to the catalytic capacity of faujasite, p. 5, (Tr. 2033); and (12) Fleck (D–An, app. December 14, 1956, issued 1960).

The Thomas patent (DX–AA), taught the general desirability of removing the alkali metal ions from the catalyst composite. The methods suggested for accomplishing this were set out in very limited manner, but the conclusion that they should be removed to avoid a decrease in catalytic selectivity and activity was recognized as being important (p. 2, Col. 2, lines 70–76). However, nowhere does the patent specify the minimal amount of sodium tolerable or the variable conditions under which such percentages might flexibly become tolerable and functional for cracking purposes. It simply recognizes the concept that sodium ions in a cracking catalyst may be regarded as a kind of catalytic poison under certain conditions. The Thomas patent is not crucially meaningful to the relevant issues here, except that the sodium content of such a catalyst should be minimized.

The Ahlberg-Thomas patent (DX–AB) issued in 1945, teaches that the removal of alkali metal ions from inorganic oxide gel catalysts is required, so that the catalytic composite will not be subject to fluxing and sintering at high temperatures, if these impurities are not removed (p. 3, Col. 1, lines 48–60). The patent further teaches that the use of kaolin (clay) in the mixture is an aid as an inactive ingredient (p. 1, Col. 2, lines 26–30) to the creation of a desirable effect of decreasing the formation and cleavage of carbon upon the catalyst when in use in catalytic cracking reactions, so as to prolong its effective life. It will then require less periodic cycle time which would be wasted on regeneration (p. 4, Col. 1, lines 35–58). Grace suggests that the action of the composite catalyst is actually diluted by the addition of the inert ingredient, but that it is almost as active as the catalytic material alone (DX–AB–1). When the volume of active material is less than 50%, the inert material in the mixture would be considered a matrix; but if the inverse condition existed, the inert material would be considered as a binder (Turkevich Tr. 1936).

The Pitzer patent (DX–AC) issued in 1945, relates to the discovery that the temperature stability of silica-magnesia catalysts is increased by the addition of lanthanum oxide during catalytic preparation. Since lanthanum is one of the several rare earth metals, sometimes loosely referred to collectively as rare earths, Grace would ask the Court to project its use as relevant prior art, in the plaintiff's '253 patent, since rare earth was used there to provide temperature stability (p. 1, Col. 2, lines 10–14; p. 2, Col. 1, lines 8–11; and p. 11, Col. 1, lines 45–54). No mention is made in the patent to its use with silica-alumina as the catalyst.

The Schwartz patent (DX–AE), applied for in 1954, was issued in 1959, and he assigned it to Mobil, his employer. At one time prior to 1956, Schwartz had worked with Rosinski at Mobil (Tr. 743). His discovery here relates to the production of inorganic oxide gel catalysts having an unusual resistance to attrition. It provided for adding a quantity of solid powdered material, which was insoluble in the sol (p. 1, Col. 2,

lines 63–69), and could be a catalytically active or an inert material. The chemical composition of the powder was not of importance, insofar as its ability to impart attrition resistance to the ultimate gel. It was essential, however, that the powdered material have a particle size, "a weight mean particle diameter in the range of 1 to 5 microns," that it be insoluble in the sol, and that it be infusible at the temperature of drying the hydrogel and the temperature of calcination (Col. 5, lines 40–53). He lists a great number of additive materials, which might be chosen. Among them are included cerium, a rare earth, and cerium oxide (Col. 6, lines 3–7). He also refers to the prior art teaching of removing alkali metals from inorganic oxide gels by base-exchange (Col. 7, lines 10–18) (Turkevich Tr. 1948; Rosinski Tr. 737–738). Grace suggests that the large pore synthetic zeolites X and Y, which did not become available until 1956 (Rosinski Tr. 751), met fully the requirements specified in the Schwartz patent pertaining to powdered additives when they did become commercially available. Grace claims predictability and obviousness to an entry in his laboratory book, November 13, 1958, proposing the preparation of a catalyst containing a zeolite dispersed in an inorganic oxide gel material (DX–AAT). Close scrutiny of the memo indicates it is entitled, "Preparation of Adsorbents and/or Catalyst—Molecular Sieve in Bead Form;" and refers to the dispersing of powdered molecular sieves in a matrix of low density silica. Grace claims that all that remained after Schwartz's invention, to bring into existence the zeolite containing composite catalyst of Mobil's patents, was the advent of the large pore zeolites by Milton and Breck. However, Schwartz did not teach a crystalline zeolite material as being any part of the catalyst, but rather he described the material as being an amorphous silica-alumina catalyst (Tr. 2610). Neither does it teach base-exchange with rare earth cations. It reports no catalyst having selectivity or activity substantially greater than the conventional silica-alumina used as a comparison standard in the '249 patent; and it did not suggest incorporating crystalline zeolites in a silica-alumina catalyst (Tr. 1459–1461).

The Cramer-Houser patent (DX–AF) was assigned to Mobil. It is concerned with an improved silica-alumina cracking catalyst, which has high resistance to attrition, stability to deactivation by steam, and possesses the physical attribute of high diffusivity during the catalytic cracking process. It also includes a method of preparing spheroidal particles of an attrition resistant catalyst, resistant to steam and thermal treatment. Column 6, lines 17–28 provide:

"The powder incorporated in the sol in accordance with the present invention, as previously noted is a highly calcined form of alpha alumina. The particular form of alumina employed is critical in achieving the desired catalyst characteristics of high density, high diffusivity, and resistance to attrition. It is essential that the powdered calcined alumina have a weight mean particle diameter in the range of 2 to 7 microns; that it be insoluble in the sol, i. e. that it maintain its powdered status upon disperson in the sol and that it be infusible at the temperature of drying the hydrogel and at the temperature of calcination."

The Milton patent (DX–AG), applied for December 24, 1953, was issued April 14, 1959 and assigned to Union Carbide. It states that the principal object of its invention was to provide an adsorbent of the molecular sieve type with improved absorbing qualities; and that a further object was to provide a novel crystalline metal aluminum silicate suitable for use as an adsorbent. The patent went on to teach that "[c]ertain adsorbents, including zeolite X, selectively adsorb molecules and are called molecular sieves." Furthermore, that "[m]olecular sieves have a sorption area available on the inside of a large number of uniformly sized pores of molecular dimensions. With such an

242

arrangement molecules of a certain size and shape enter the pores and are adsorbed, while larger or differently shaped molecules are excluded." (Col. 1, lines 40–48). "It will be understood that the refusal characteristics of zeolite X are quite as important as the adsorptive or positive adsorption characteristics." (Col. 2, lines 10–13).

The fact that benzene is adsorbed would indicate that the pore size is greater that 6 Angstroms,[19] because by determining the size of the molecule adsorbed one can ascertain the diameter of the pore openings (Turkevich Tr. 1963–1964). The patent teaches that "ion exchange of the sodium form" of zeolite X may be accomplished by conventional ion exchange methods (Col. 6, lines 49–51; Tr. 1965). Hydrogen, ammonium, cerium, calcium and magnesium are identified as suitable replacement ions (Col. 6, lines 41–43, 59–70; Tr. 1966–1967). Among the ways of identifying zeolite X and distinguishing it from other zeolites (this was in 1953) and other crystalline substances, the X-ray powder diffraction pattern had been found to be a useful tool (Col. 7, lines 33–36).

The Breck patent (DX–AH–1) was filed May 12, 1961, issued April 21, 1964, and assigned to Union Carbide. However, it should be noted that it is a continuation in part of application serial No. 862,062 filed December 28, 1959, which was itself a continuation in part of application serial No. 728,057, filed April 14, 1958. The patent, synthetic zeolite Y, relates to a method of making a synthetic, crystalline zeolite sodium aluminosilicate of the molecular sieve type, useful as an adsorbent (Col. 1, lines 8–11). Zeolite Y differs from zeolite X in the proportion of silicon and aluminum which each contains. The silica-to-alumina ratio of zeolite Y is greater than 3 parts, and ranges up to about 6 parts silica to 1 part alumina (Col. 1, line 60; Tr. 1977–1978).

"Zeolite Y is distinguished from other molecular sieve types, for example zeolite X, described in U.S. Patent No. 2,882,244, by its exceptional stability toward steam at elevated temperatures. This is a property which makes zeolite Y particularly suitable for such processes as gas drying, especially where the adsorbent bed must withstand numerous adsorption-desorption cycles." (Col. 17, lines 69–75).

"Zeolite Y may be used as an adsorbent in any suitable form. Powdered crystalline materials have given excellent results as have pelleted forms. The pelleted forms may be obtained by pressing into pellets a mixture of zeolite Y and a suitable bonding agent such as clay." (Col. 19, lines 26–30).

Grace asserts that Mobil cannot claim the credit for recognizing the potential of either zeolite X or Y as cracking catalysts; but that Kimberlin and Rabo had previously recognized the suitability of base-exchanging forms of these zeolites (including rare earth-exchanged and rare earth ammonium-exchanged forms) as catalysts for hydrocarbon conversion purposes. Furthermore, that Hart and Bourguet had used rare earth-exchanged zeolite X to catalyze such processes.

The Kimberlin patent (DX–AJ) was applied for February 5, 1957, issued February 14, 1961, and assigned to the present owner, Esso Research Engineering Company. It relates to the preparation of improved catalysts in the form of large pore crystalline zeolites suitable for use as hydrocarbon conversion catalysts (Col. 1, lines 17–18). The patent refers to the previous amorphous catalysts available and cited the former prevailing theory that, if any crystalline material were present in the final catalytic product, hydrocarbon conversion was seriously adversely affected and the byproduct formation increased (Col. 1, lines 59–62).

In contrast to this, the Kimberlin patent states: "a catalyst has been discovered that shows high activity and selec-

19. *See* notes 2 and 8, *supra.*

tivity while comprising a highly ordered crystalline material characterized by having pores of nearly uniform dimensions in the range of about 6 to 15 Angstroms" (Col. 2, lines 26–30; Tr. 1984). After noting the presence of sodium atoms in the composite, Kimberlin points out that, "[in] the majority of cases, however, it is desirable to convert the sodium form of the alumino-silicate crystal to a more active form. For this purpose, the sodium crystals are reacted with metal salt solutions that enhance the catalytic behavior. These metals are of the type already enumerated, and may further include cobalt, nickel, copper, calcium, magnesium, chronium, iron, silver, gold, platinum, zinc, cadmium, rare earths, mercury, lead and the like" (Col. 3, line 74, Col. 4, line 80). He asserts at column 4, lines 8–10 that "[f]or hydrocarbon conversion catalysts of the cracking or alkylation type, it is particularly desirable to exchange the sodium with magnesium. . . ." (Tr. 1988). He also teaches that "it is only necessary to replace about two-thirds of the soda with the other metal oxide. The removal of more soda than this does not bear too great an influence on the behavior of the crystals as catalysts" (Col. 4, lines 15– 19).

He points out that:

"it is possible to obtain crystals having pores between about 3 and 5 Angstroms diameter. Other metal forms of this crystalline sodium alumino-silicate may be prepared in a manner identical with the above 6 to 15 A. pore diameter crystal. The reactions which the 3 to 5 A. pore diameter catalyst will promote are identical with the same metal form of the 6 to 15 A. pore diameter material. However, the 3 to 5 A. pore diameter crystals will not allow any but straight chain paraffins and olefins to enter the interior of the pores which present the active catalyst sites. Thus, branched chains, acyclics and all ring hydrocarbons are excluded from the catalytic sites, thus restricting the

versatility and usage of this material as a catalyst." (Col. 4, lines 24–38). The Kimberlin-Esso patent taught that rare earth metal-exchanged zeolites were effective cracking catalysts and surpassed in performance their predecessor amorphous catalysts.

The Bourguet-Hart patent (DX–AK) was filed October 17, 1960, issued July 6, 1965, and assigned to Mobil. It relates to the use of large pore crystalline aluminosilicates as cracking catalysts (uniform pore openings between 6 and 15 Angstrom units) (Col. 2, lines 39–40; Tr. 1998–1999). They are ion-exchanged with rare earth ions, or with rare earth ions in combination with other metal ions, to replace at least about, 75% of the original alkali metal content of the alkali metal aluminosilicate with said ions and effectively reduce the alkali metal content of the resulting composite to below 4% by weight (Col. 2, lines 35–47).

Rosinski testified that Bourguet and Hart, both employees at Mobil, had investigated catalysts prepared from crystalline rare earth aluminosilicates having uniform pore openings between 6 and 15 Angstroms (DX–BT and DX–BS); But he distinguished their work as being with the pure "X zeolite," exchanging it with rare earth, whereas he and Dr. Plank were concerned with the making of a composite, the combination of the crystalline material in the matrix, and exchanging that with rare earth (Tr. 725–726). Rosinski stated that he knew of no one at Mobil who conducted tests for cracking gas oil with any metal acid zeolite (a zeolite base-exchanged to replace sodium with metal and base-exchanged to replace part of the sodium with ammonium) prior to his work with Dr. Plank. Nor did he know of anyone before then, who had cracked gas oil with REHX or REHY, either in a matrix or otherwise (Tr. 1423–1424).

Grace claims that since Rosinski and Plank were aware of Bourguet's and Hart's work with rare earth-exchanged

large pore zeolite catalysts (DX–FM) before they did their own work with these materials (Tr. 2680–2682), such work should be classified as prior art on the issue of obviousness, even though the Bourguet-Hart patent application was filed after that of Dr. Plank's and Rosinski's work on rare earth-exchanged zeolites. Armour Pharmaceutical Co. v. Richardson-Merrell, Inc., 264 F.Supp. 1013, 1016–1017 (D.Del.1967), aff'd, 396 F.2d 70 (3rd Cir. 1968); Servo Corp. of America v. General Electric Co., 337 F. 2d 716, 720 (4th Cir. 1964).

However, Dr. Turkevich characterized this zeolite rare earth-exchange catalyst of the Bourguet-Hart patent as an overly active catalyst. A 90% conversion is considered to be a very high conversion, yielding 35.5% gasoline (Cols. 9 and 10, table 1). At this level there is overcracking, so that unwanted gas and coke is produced, causing a contamination of the product and the catalyst (Tr. 2002–2003). He observed that such an overly active catalyst could be modified, thereby causing it to yield a higher percent of gasoline, by diluting it with either an inactive or relatively inactive material and thereby decreasing its chemical activity. By diluting it in a matrix or a support or a composite, one would be moderating its activity (Tr. 2005, 2073).

Rabo patent application (DX–AM–2 in DX–E) was filed on December 30, 1959, and resulted in the issuance on February 22, 1966, of the Rabo patent 3,236,762 (DX–AM–1). The patent as finally issued contains some information which was not in the application when it was filed (Tr. 2009). It teaches that ion-exchanged zeolite Y is an active catalyst for many hydrocarbon conversion processes including cracking (Tr. 2011–2012); and that replacing by base-exchanging the alkali monovalent metal cations, such as sodium, with polyvalent metal cations having more than one charge, such as calcium and rare earths, enhances the catalytic activity of zeolite Y. After zeolite Y has been base-exchanged with polyvalent cations, additional alkali-metal cations can be removed by base-exchange with specified non-metal cations, such as ammonium cations (Tr. 2014–2015), which decompose on thermal treatment and leave protons or hydrogen ions on the surface. Rabo found that he got the highest polyvalent activity from calcium and cerium ion exchange and that ion exchanged zeolite Y was more active and selective than ion exchanged zeolite X. He also determined that ion exchanged zeolite Y had higher cracking activity than silica-alumina (Tr. 2024). Rabo also pointed out that temperature was an exceedingly critical factor in the process of his invention. On page 19 of the application he noted that the temperature of isomerization must not be carried out above 452° centigrade, since undue cracking will occur at that temperature range. Indeed, even above 400° centigrade hydrocracking becomes significant and decreases the net yield of liquid product (Tr. 2023). Generally, the more active the cracking catalyst, the lower the temperature at which it will operate.

Dr. Turkevich explained that these large pore crystalline aluminosilicate catalysts described in the Kimberlin patent, the Bourguet-Hart patent, or the Rabo patent applications could not be used in a present day commercial cracking unit, because the particles of the large pore crystalline aluminosilicates are too small and fragile. He claimed that the art taught that they should be made into a composite or matrix for support (Tr. 2038). However, this latter conclusion appears to the Court to be more a matter of hindsight, rather than logical anticipation in this unknown and unpredictable field of catalytic action.

The Fleck patent (DX–AN) was filed December 14, 1956, issued November 29, 1960, and assigned to Union Oil Company. The invention relates to the cracking of hydrocarbons contaminated with nitrogen materials which deactivate the catalyst (Tr. 2054). The patent states:

"It is another specific object of this invention to provide in such a crack-

ing process a cracking catalyst which comprises a physical mixture of a cracking catalyst such as acid treated natural clay and a natural or synthetic zeolite metallo alumino silicate having pores of at least 7 A. in diameter." (Col. 2, lines 53–58).

Acid treated clays had been used in cracking catalysts prior to 1950, and Dr. Turkevich characterized the clay element on the silica-alumina gel component as a matrix for the crystalline aluminosilicate component (Tr. 2046; Col. 3, lines 45–65). The prime purpose of this process, however, was to absorb the nitrogen impurities peculiar to and prevalent in the California basin crude oils, which made the feedstock especially difficult to crack because of the inherent nitrogen contamination and reduced gasoline yield. Column 5, lines 26–30, of the patent explain:

> "It is believed that this effect is due to the fact the zeolite exhibits a highly preferential adsorption for these same nitrogen compounds in preference to the hydrocarbon compounds of the same boiling range even at cracking temperatures. This has however not been established fully as yet."

In Fleck the adsorbent was the molecular sieve and the cracking catalyst was the silica-alumina amorphous gel or acid treated clay. The silica-alumina gave its normal cracking performance after the removal of the nitrogen compounds in the feedstock (Tr. 2593). At no place does Fleck specify the technique of ion exchange or low sodium content (Tr. 2646); he teaches that the zeolite is an adsorbent; he did not disclose the performance nor did he indicate its reaction to steam treatment. It did not anticipate the '249 patent.

### Misuse Defense

A separate category of reasons advanced by Grace to defeat the enforceability of the Mobil patents is Mobil's purported monopolies of the patents in suit and its alleged adoption of unlawful policies and practices in licensing its zeolite-containing catalyst patents.

Grace claims that Mobil's patent licensing proposals were presented as a package, in that the royalty for individual patents was virtually the same rate as for several. It asserts that during their extensive negotiations, Mobil attempted to justify its proposal under a "defined field" arrangement. Mobil suggested a license under a package of patents at a royalty of $200 per ton, which amounted to a 25% royalty on an $800 per ton selling price (Tr. 2777–2778; DX–QH). Grace's claim is that between 1964–65, it had asked for a license on the '249 patent and that Mobil's response was no different for the single license than it was for the "package" or field license.

Thereafter, in 1968, when Grace requested from Mobil a license under the three patents then in litigation, Mobil responded with an offer of 12% for the prelitigation period from 1964 to April, 1967, whether Grace took a license under only five Mobil patents, all Mobil patents, or any combination of Mobil's and Esso's patents [20] (PX–322). By April 1970, Mobil agreed that after the Esso-Kimberlin reissue patent expired, Mobil would charge no more than 8.4% for its own patents (PX–362; PX–363) during the period from April 1967 to the 1968 date of the offer under the five specific Mobil patents or under all the Mobil patents (Tr. 3077–3081). The proposal included a license at 7% for the five Mobil patents, or at 8.4% for all (Tr. 3085–3091). Grace argued that the additional 1.4% for a license under several additional patents could not be considered to be a reasonable economic alternative.

A second alleged patent misuse asserted against Mobil was that it owned three categories of patent claims in the '249, '253 and '357 patents: (1) those

20. The Kimberlin reissue patent was granted on April 11, 1967 (DX–WX). Mobil and Esso entered into an arrangement in 1966, which gave Mobil the right to grant licenses to others under the reissue patent, when and if it was granted (Tr. 3062–3065).

directed toward zeolite-containing catalyst compositions; (2) those concerned with catalytic cracking; and (3) those directed toward the techniques of making the catalyst compositions. During its negotiations with Mobil, Grace requested that the former offer separate licenses to Grace as a manufacturer and to the user-refiners (Tr. 2762–2763). Grace claimed that the practical effect was to tie a license under its patent rights relating to zeolite catalysts and their use by refiners to licenses under its patent rights relating to the methods of making such catalysts. Grace claimed that such practices constituted an illegal tie.

Grace further complained that many of the Mobil patents issued on applications pending in the Patent Office during the existence of Mobil's licenses had variable termination dates. It pointed to the '357 patent in suit, which issued in 1969, whereas the '249 and '253 had issued in 1964. However, the proposed license arrangements provided for the same 12% royalty, both before and after the pending patent applications had actually issued as patents. Grace claimed that none of Mobil's proposed licensing agreements provided for any reduction in royalties as the patents expired, and that any such agreement which would require royalties to be paid on unexpired patents constituted a patent misuse. More specifically, the Esso-Kimberlin reissue patent, which had been included in the Mobil "package licenses," would expire in 1978, 3 years before the 1981 termination date of Mobil's proposed licensing agreements (DX–WX). Grace points out that it was only just prior to the Mobil Oil Corp. v. Filtrol Corp. and Texaco, Inc. litigation in California, that Mobil recognized the alleged illegality by submitting letters to its licensees, Cyanamid (PX–362) and Nalco (PX–363) on April 22, 1970, stating that it was implicit in their arrangement that, when the Esso-Kimberlin rights in the agreement expired, the 30% royalty attributed to the Esso-Kimberlin patent would automatically terminate. Grace claims that this letter was a belated attempt by Mobil to purge this illegal provision from the existing licenses and that, at least during the period of misuse, Mobil's patents were not enforceable.

The misuse issues raised by Grace in this case were indirectly and unsuccessfully litigated[21] in Civil Case No. 69–633F (D.C.C.D.Cal. June 24, 1971. Grace was not a named party in that action, but the defendants Filtrol and Texaco attempted to rely upon evidence of Mobil's negotiations with Grace to support a similar charge that Mobil had engaged in unlawful "package licensing." That suit also alleged Sherman Act and Clayton Act anti-trust violations relating to Mobil's cross-licensing agreement with Esso's Kimberlin patent.

Mobil negotiated with Grace concerning the licensing of specific claims under these patents without any success. The evidence surrounding the negotiations, which extended over 3 years, indicates that there came a time when Grace was not negotiating in good faith. These tactics are revealed in a Grace memorandum dated August 31, 1967 (PX–319), from Page Edwards, Grace's chief negotiator, to his superior, Executive Vice-President Tracy. The memorandum refers to an internal Grace

21. ¶ 65: "In May 1968 Mobil sent to Grace a written offer, similar to the one addressed to Filtrol and Texaco offering various possible licenses, including some under specified patents . . . . This proposal expressly stated that Mobil was willing to negotiate a license for any patent or patents. Grace desired. Grace rejected the Mobil proposal and refused to negotiate further . . . ."

¶ 66: "In sum, the record establishes that Mobil did not coerce Grace to accept any unwanted package of patents. To the contrary, the evidence demonstrates that Mobil was willing to license Grace for less than all Mobil's patents on a reasonable basis if Grace desired and in fact made a good faith effort to satisfy any interterest Grace might have had in a license under only one patent, or some variation thereof."

meeting on October 28, 1966, and reminds Tracy that,

"It was agreed that we would attempt to continue to bounce the ball, to use your term, with Socony. It was agreed that we could not take a license on the terms offered and that it was to our advantage to try and delay taking any licenses until the question of ownership of the inventions was clarified." (Tr. 3039).

Grace's chief negotiator admitted that Mobil had never refused to discuss granting to his company a license to accomplish its business needs (PX–332; deposition Tr. 370–371). In other words, when viewed in the context of the entire negotiations between the parties, it now appears that Grace never seriously bargained in good faith for the immediate issuance of a license under specified patents (Tr. 3030–3031; PX–319).

The possibility of a license to Grace under certain claims in the '249 patent was first discussed in July, 1964, shortly after the first five Mobil patents issued (PX–728, tab 17). While Grace's business representatives talked about broader clearance under the Mobil patents, Grace's counsel narrowed the request and Mobil expressed a willingness to grant such a license (PX–333; Shambaugh deposition Tr. 120–121). Shortly after this meeting, Mobil submitted Grace a proposal for a license in a defined field of technology (DX–QH). The reason for this submission was that the Grace negotiator expressed the desire to obtain a license free suit, under any of Mobil's patents (Tr. 2987–2988).

Although Grace made no counter-proposal and submitted no written draft to Mobil (Tr. 2989; 2855–56), their business representatives met again in October, 1964. At that meeting, Grace's patent counsel requested Mobil to prepare another draft, this time granting a license under the '249 patent, with the option in Grace to add additional Mobil patents to the license whenever it desired with no increase in the royalty

rate (Tr. 2989–3101). Mobil prepared and submitted such a draft on October 26, 1964 (DX–QP).

Grace complains that Mobil's October 26, 1964, draft proposal set a 25% royalty, the same earlier suggested for a defined field license (Tr. 2706). However, since Grace was seeking an open-end option to include at will any and all Mobil patents without any increase in royalty, it was in effect seeking the same license Mobil had previously offered and the royalty would not change (Tr. 2989–2990). This draft form had been submitted at Grace's request. Mobil had expressed a willingness to grant a license for the '249 patent alone at a lower rate because, under those circumstances, it could increase the rate as additional patents were added (Tr. 2990). While Grace's manager stated that Mobil's proposal was unacceptable, it was conceded that the proposal could serve as a basis for a full agreement (DX–RF; Tr. 2858, 2861–2862).

Negotiations continued, but the business people within Grace prevailed in their demands; that Grace obtain a license, where it would be "free of liability under any Mobil patents" (Tr. 2994). From this position negotiations centered around a "defined field" license, which would afford Grace complete freedom to make various kinds of catalysts under Mobil's patents without the risk of litigation or later demands for royalties. This position is confirmed by the internal corporate memorandum of March, 1965, which noted that Grace was anxious to be permitted to make "an infinite variety of catalysts" free from suit by Mobil (Tr. 2994; 3103; DX–RF).

In April, 1965, Mobil suggested that the parties revert to a discussion of a license "under the specific patent or patents" in which Grace might be interested (PX–297). Mobil proceeded to prepare, and was ready to send to Grace, a draft of a license granting rights under the '249 patent alone (Tr. 2999–3001; PX–284). However, Mr. Edwards of Grace advised that this was not ade-

quate, because Grace wanted to solve all of its problems with Mobil's patents (Tr. 3001; PX–332, Edmunds deposition Tr. 238).

As the negotiations continued, the main issue was the royalty rate (Tr. 3004–3005). Finally, in December, 1965, the parties apparently agreed upon a license with a royalty rate of 12%. This agreement was confirmed in a memo from Vice-President Edwards to Manager Goodall of Grace: "I telephoned Danner [of Mobil] and advised him that we would be willing to sign under the above conditions . . . [for] 12% . . . ." (DX–TC; Tr. 2872–2875). This agreement was sufficiently firm from the point of view of Grace's management, that a requested budgeted item was sought from the Board of Directors with which to start building a plant to produce an X-type zeolite (Tr. 2808; 2884).

At about that time, the Rabo-Union Carbide patent having to do with Y sieves in catalysts issued. Grace became concerned as to whether or not it might dominate the area in which they were interested and consequently, changed its opinion as to the amount of royalties it should pay (Tr. 2810). It should also be noted that prior to the December, 1965, "meeting of the minds" between Grace and Mobil, the Kimberlin-Esso patent (No. 2,971,903) of February 14, 1961 has already issued. This latter patent described a hydrocarbon conversion process in which a crystalline aluminosilicate zeolite was used as the sole catalyst in the reaction zone. This posed no infringement problem to Mobil, since its invention encompassed a combination of a crystalline aluminosilicate zeolite in a catalytic matrix, whereas Kimberlin claimed the crystalline zeolite as the sole catalyst in the reaction zone.

Subsequently, in 1962 after Mobil had announced the development of its new catalyst, Esso applied for a reissue of its Kimberlin patent, seeking to eliminate the word "sole" from its claims. If this were granted, it could cover a hydrocar-bon conversion process using an aluminosilicate zeolite either alone or in combination with other materials and could include Mobil's new catalyst, which called for a crystalline aluminosilicate in a matrix.

By early 1965, the examiner had allowed the Kimberlin Reissue, subject to the pending interference litigation between Mobil and Esso. A blocking patent situation existed. Esso in the reissue patent got claims, which were broad enough to cover not only the product Grace was manufacturing, but also the product which Mobil was manufacturing, subject to the latter's possible intervening-user claims. Thus two adverse parties held patents, so that neither party could freely practice the advance without infringing the other's patent and no third party could lawfully do so without clearance from both patentees. In order to resolve this impasse, Mobil and Esso negotiated a non-exclusive cross-licensing agreement on or about July 1, 1966.

At the time Grace backed away from its proposed December, 1965 written agreement with Mobil, it made no claim that its refusal to execute that license agreement was due to any dissatisfaction with the type of license negotiated or any alleged insistence by Mobil that Grace accept a license under patents it did not desire (Tr. 2874, 3008). Nor was there any factual basis to support such a claim. Grace did not then assert or claim during the negotiations that the Mobil patents were invalid or that Grace had not infringed them (Tr. 2864–2866, 3028).

On or about June 29, 1966, Manager Goodall of Grace received from its Vice-President Edwards a memorandum (DX–UH) instruction that Grace would not sign a license agreement, but proposed an arrangement under which it would pay Mobil for past infringement (at the 12% royalty rate previously agreed upon) and execute an agreement giving Grace an option for a "defined

field" license [22] in the future. Mobil accepted this new proposal (Tr. 2878–2879, 3019).

However, after Mobil agreed, Grace again withdrew, declining to enter into an option agreement. At Mobil's request, Grace set forth the reasons for this decision in a letter to Mobil dated December 9, 1966. The reasons set forth indicate that Grace's action was in no way related to any claimed desire for a license under specific patents or for a different form of license grant than the parties had agreed upon (Tr. 3029–30, 2888; PX–574).

On December 14, 1966, Mobil and Grace negotiators met again (Tr. 3031). This was the meeting prior to which the Grace representatives had been given specific instructions to stall and simply keep negotiations open (PX–319). According to Mobil's patent counsel, corroborated by his contemporaneous memorandum (PX–302), at that meeting Grace raised the possibility that it might consider a license under certain Mobil patents with an option to add any other patents Grace identified in the future relating to zeolite catalysts (Tr. 3032–3033). Although Grace never identified any patents it wanted to be included under such a license, Mobil stated that it was willing to grant such a license, if Grace desired. The latter responded that it would not enter into a license unless they were required to pay only "a very, very low royalty" (PX–302; Tr. 3033). This discussion led to a conference with higher officials of Grace, which proved fruitless (Tr. 3040–3046). Just prior to the commencement of suit, Mobil's patent counsel and Grace's Vice-President Edwards, together with Blackwood, another Grace official, reached an understanding on still another licensing agreement, which they agreed to recommend to Grace's Board of Directors. This latter proposed agreement contained a "defined

field" license and an indemnification against other third party patents, including Rabo. Shortly thereafter, Edwards called Mobil's counsel and advised him that, while he would still recommend the license should be agreed to by Grace, it was likely that the Board would reject it. Mobil then commenced this suit in May, 1967, but simultaneously advised Grace, that it was still willing to execute the agreement as submitted. However, no agreement was ever signed. Grace continued to produce its offending catalysts and set up a budgetary reserve account against potential royalty payments to Mobil, in the event it were found that liability attached as a result of infringement (Tr. 1841).

Mobil had subsequent discussions with Grace in 1968 (Tr. 3046) and continued to offer to license Grace under any patent or patents the latter desired. This is confirmed by the specific written offers, which included proposals for a license under enumerated Mobil patents (PX–322). Thus, it is apparent that "Mobil has been and remains willing to license any one or more of the patents that anyone is interested in" (Tr. 3049). There is no evidence to substantiate the allegation that Mobil in any way attempted to coerce Grace to take a license under more of Mobil's patents than Grace desired, or that Mobil "conditioned" any grant upon acceptance of a license under unwanted patents.

### Expiration Issue

The license agreements entered into between Mobil and its licensees terminate with the first Mobil patents to expire on July 7, 1981 (Tr. 3061–3062). Each licensee had the right to terminate its license unilaterally after the fifth anniversary, leaving it free to act during the remainder of the period (Tr. 3062); and each license provided that a royalty would be paid only when it infringed Mobil's patents covered by the license

---

22. A "defined field" license is one which defines a technological area of interest to the licensee. It usually provides to a licensee immunity under any patent of the licensor, up to a specified invention date, current with or in the future, which may be infringed by the licensee's operation within that defined technological field.

(PX–295, ¶ 3.02; Tr. 3061). Since an expired patent cannot be infringed, Mobil's licenses cannot and do not involve the collection of post-expiration royalties.

 Grace claimed that Mobil's sub-license of rights under patents which were part of its cross-license agreement with Esso and expired prior to 1981, demonstrated that Mobil was requiring payments of royalties on expired patents. The Esso patent rights in question admittedly would expire in 1978 (PX–363; Tr. 2910), and to the present time no such royalties have accrued. No evidence was offered to show that Mobil compelled or coerced any licensee or potential licensee to pay royalties on a group of patents, some of which expired before others. Prior to the issue being raised in the present litigation, Mobil had already advised its licensees by letter, after the matter was called to its attention, that when the Esso-Kimberlin reissue patent expired in 1978, Mobil would deduct that portion of the royalty payments attributable to the expired patent (Tr. 3066–3067; PX–362; PX–363). Mobil's patent counsel also confirmed the fact that any prospective licensee who preferred to go directly to Esso could negotiate its own agreement; and at such time as Esso received a patent, which resulted in a royalty under the Mobil arrangement, the latter would reduce its royalty by the amount of the payment it would have had to make to Esso, if they had taken the Esso rights from Mobil directly (Tr. 3065). The Court finds that neither Mobil's licenses of its own patent rights, nor its grant of rights under the Esso patents, resulted in a binding contract for the payment of royalties during the period covering the expired patents.

 Grace further contended that Mobil's proposed royalty agreement of 8.4% under a "defined field" license (which might invade in part, as many as 40 patents held by Mobil) against a 7% royalty covering 5 specific patents was coercive, did not provide a reasonable economic alternative (Tr. 3090), and constituted a misuse by Mobil of its patents. The Court finds that the variations of catalytic claims in this area of manufacture were so variable, intertwined, and complex, that, absent a "defined field" license, the limiting of catalytic content to specific patents would require continual chemical testing to police the royalty contract (Tr. 3081–3082). A simple comparison of the number of patents encompassed against the price variable of the royalty is not a fair and true test of the dollar value of the licensees, especially where the composition of the patented products are so intertwined as to be almost inseparable.

### Licensing of Users

 Grace also claimed that Mobil forced catalyst manufacturers to accept licenses covering the use of the catalyst and refused to license users directly. The evidence discloses that Mobil had indicated its willingness to license users (Tr. 3052), but its preference was to license the catalyst makers.[23] The reason for this was that, since it was then developing catalysts, the logical procedure was to license the maker. Manufacturers had the practice of issuing to each refiner who purchased their catalyst an indemnification from all patent claims that might be asserted against the use of the catalyst in catalytic cracking; and a refiner holding such an indemnification had no incentive to negotiate a royalty license (Tr. 3051). However, early in 1967 and again in 1968, Mobil did offer to make and sell the catalyst under Mobil's product claims, with the right to offer a separate license at a separate royalty to the refiners for the right to use the catalyst (Tr. 3057; PX–304; PX–322). It was explained that the total of the two royalties (one

23. Mobil did grant licenses to American Cyanamid, Houdry, and Nalco. These licenses gave the right to manufacture and sell, as well as to pass on immunity to the refineries customers (Tr. 94).

collectible from the catalyst maker and one from the refiner) would necessarily have to be greater than the single 12% royalty discussed, in order to cover the additional administrative costs to Mobil, which would be involved in the collection of royalties from two sources instead of one (Tr. 3054, 3057–3058). Grace responded to the proposal that it was not interested in a license which involved such a "split royalty," if the total royalty to be paid by it and the refiner exceeded 12% (Tr. 3059; PX–307, p. 1; PX–578).

Mobil's proposal that the total royalty to be collected from the different sources should be higher than for a single royalty collected from one licensee cannot be considered unreasonable in light of the increased expense of supervising and administering such procedures. This fact was recognized by Grace itself, when it indicated by a previous proposal to Mobil that the latter charge a royalty of $40 per ton, where the entire rights were given to the catalyst maker and, under the divided responsibility, $10 per ton to the maker and $50 a ton for the user (DX–QX; Tr. 3054–3056). The Court finds no unlawful misuse by Mobil in its licensing of catalyst makers to make, use, and sell catalysts under the Mobil patents.

### Unlawful Kali-Chemie Tying Issue

■■■ In an effort to demonstrate Mobil's alleged illegal policy of package licensing, Grace injected into this suit the allegation that Mobil unlawfully "tied" the sale of catalyst component to its patent license to Kali-Chemie. This same issue was unsuccessfully alleged in the California Filtrol-Texaco suit, hereinbefore mentioned, and the factual record does not support Grace's claims here. From 1962 to 1966, Mobil and Kali-Chemie (a German corporation) were engaged in a joint venture wherein Mobil provided Kali-Chemie with the active component necessary to produce catalysts. The latter manufactured and marketed the catalysts, and the par-

ties evenly divided the profits of the venture (DX–OX; Tr. 3068–3071).

Contrary to Grace's assertions, this relationship was not a "tying" arrangement where one party sells a product to another on the condition that the buyer also purchases some other product, but rather it was a simple joint venture. Grace attempted to characterize their relationship otherwise, by virtue of a letter (DX–PJ) from Kali-Chemie to Grace in October, 1963, stating its lack of need for catalyst component in view of its joint venture with Mobil. This did not establish evidence of any unlawful tying arrangement and the oral testimony was to the contrary (Tr. 3068–3073).

In late 1966, Kali-Chemie entered into a defined field patent license with Mobil under its crystalline aluminosilicate patents (PX–318). Although it has purchased some catalyst component from Mobil since that time, it was not required to do so. In fact, Kali-Chemie's purchase contract with Mobil specifically states that Kali-Chemie may purchase its catalyst component from any source it desires (PX–317, p. 5, ¶2). The evidence further establishes that none of Mobil's licensees is required to purchase catalyst components from Mobil (Tr. 3073). Thus, Grace has failed to establish that Mobil tied its sale of any catalyst component to a license under its patents with respect to Kali-Chemie or any other Mobil licensees.

### Findings Re: Infringement of Mobil Patents

■■■ Defendant manufactures and sells catalysts specially designed and intended for use by defendant's customers for the catalytic cracking of gas oil to form gasoline. The purchasers of defendant's catalysts are refiners of gasoline who carry out catalytic cracking of gas oil. The products sold by defendant which are accused of infringing the patents in suit, hereinafter collectively referred to as the "accused catalysts," are sold by defendant under the trade names, XZ–25, XZ–25+, XZ–36, XZ–40, DZ–5, DZ–7, OZ–1, and CBZ–1.

Each of the accused catalysts contains a minor proportion of crystalline zeolite particles suspended in and distributed throughout a matrix of an organic oxide gel, also referred to as amorphous silica-alumina.

When the accused Grace catalysts are subjected to the same catalytic cracking tests as described in the patents in suit, they show the same performance advantages as do the patented compositions. The accused catalysts perform substantially the same function in substantially the same way to obtain the same results as the patented catalysts. The accused catalysts have the same selectivity advantages as the patented catalysts, i. e., the ratio of useful product (gasoline) to waste product (dry gas and coke) achieved with the accused catalysts in use is substantially the same as that achieved with the patented catalysts (PB 72–73).

The accused catalysts are made in the same manner as is taught by the patents in suit. The accused catalysts are all prepared by base-exchanging a sodium zeolite having uniform pores with both rare earth and ammonium salt solutions. In all of the accused catalysts except CBZ–1, base-exchange occurs both prior to and after incorporation of the zeolite into the matrix. In the case of CBZ–1, all of the base-exchange occurs after the zeolite is incorporated in the matrix. The patents in suit make clear that base-exchange can be carried out at any time, i. e., before, after, or before and after incorporation of the zeolite into the matrix (PB 73, 74).

The evidence relating to infringement comes primarily from the plaintiff's proofs and the cross-examination of the plaintiff's expert witnesses. Defendant did not introduce any testimony that the Court considers to have contradicted any of the infringement proofs offered by plaintiff. The Court finds that the infringement testimony offered through plaintiff's witnesses, including Professor Smith, Dr. Olson, Dr. Sippel, Mr. Kirkbride and Mr. Rosinski was completely, credible and persuasive in the issue of infringement (PB 71, 73–80).

The Court was persuaded by the testimony of Prof. Smith, an eminent expert in the X-ray study of zeolites, that each of the accused catalysts contains a zeolite component of the type described by the composition claims in suit. The Court is further persuaded by the testimony to the same effect of Dr. Olson, also a specialist in the X-ray study of zeolites. The Court is further persuaded from Dr. Olson's testimony that in making the accused catalysts, Grace effectively diminishes the sodium content, both of the zeolite and of the entire composite catalysts in the manner and to the extent described and called for by the patents in suit (PB 75, 76).

The Court is further persuaded by the testimony and exhibits presented by Dr. Sippel and by the testimony based upon the study of Grace's flow sheets presented by Mr. Kirkbride, Mr. Rosinski and Prof. Smith, that each of the accused catalysts is made up of spheroidal particles in which finely divided zeolite crystals are mixed with and dispersed in a matrix of amorphous silica-alumina gel (PB 77).

The zeolite contained in Grace's XZ-prefixed accused catalysts is of the X type. It is synthetic faujasite in which the silica-alumina ratio is less than 3. The zeolite in the other Grace accused catalysts is of the Y type. It is synthetic faujasite and has a silica-alumina ratio in excess of 3, i. e., between 4.5 and 5 (PB 75, 76, 78).

The Court is persuaded by the evidence that each of the accused catalysts is within the description and requirements of claim 19 of the '253 patent. The Court is also persuaded by the evidence that XZ–25, XZ–25+, XZ–36, XZ–40, DZ–5, DZ–7 and OZ–1 are each within the requirements and description of claim 19 of the '249 patent. The Court is further persuaded by the evidence that defendant's catalysts DZ–5, DZ–7, OZ–1 and CBZ–1 are each within the description and requirements of claims 7,

9, 10 and 17 of the '357 patent (PB 81–87). Grace has infringed each of the foregoing claims.

Defendant Grace had no reasonable non-infringement defense. Defendant's own writings and extra-judicial assertions persuade the Court that defendant knew its product infringed plaintiff's patent rights. Defendant, from the moment it learned of plaintiff's invention began a concerted and successful course to imitate, duplicate, and market the fruits of plaintiff's labors and expense (PB 96–102).

In manufacturing its accused catalysts, defendant followed the instructions and requirements of claims 23, 24 and 28 of the '253 patent. While defendant argues that these claims specify certain orders of treatment of the zeolite, the specification of the patent makes clear that any order of base-exchange can be employed with the same results. Consequently, the methods employed by defendant are in each case identical with or the equivalent of the claimed methods. Similarly, defendant's attempt to excuse its infringement by asserting that claim 28 is limited to the natural mineral faujasite is without merit. The claim covers synthetic faujasite as well as natural faujasite. Indeed, even if the claim were expressly limited to natural faujasite, as defendant contends, the Court would find that synthetic faujasite was equivalent to and an obvious variation of natural faujasite (PB 88–90). Defendant has infringed claims 23, 24 and 28 of the '253 patent.

Both '249, claim 1, and '357, claim 20, call for base-exchanging of the zeolite of the described type and certain other steps ending with a heating step. The term, calcination, is used in '357, claim 20, but that is simply another way of saying heating. In manufacturing the accused products, defendant has followed the instructions and requirements in its own plants, up to the heating or calcining, called for by claim 1 of '249 and claim 20 of '357. It practiced claim 1 of '249 in respect to the manufacture of all the accused products and claim 20 in respect to the manufacture of DZ–5, DZ–7, OZ–1 and CBZ–1 (PB 90–93).

Defendant knew at the time it sold each of its accused catalysts that its customers would place the catalysts as sold by defendant into their catalytic cracking units and that in the course of passage through the catalytic cracking units, the catalysts purchased from Grace would be subjected to the heating and calcining conditions specified in claim 1 of '249 and claim 20 of '357, and that consequently all of the effects of such heating or calcining would be achieved by defendant's customers. Consequently, defendant was able to achieve all of the benefits described by the patents for heating or calcining, while at the same time foregoing the necessity of itself having to undergo the expense of carrying it out. In this respect, defendant, in effect, made each of its customers its agent in completing the infringement step, knowing full well that the infringement step would in fact be promptly and fully completed by those customers. Grace is an infringer of '249 claim 1 and '357 claim 20 (PB 90–93).

The Court also finds that the activities by Grace, divorced from the activities of its customers and divorced from its commercial testing activities, constituted the appropriation of the substance of the teachings of claims 1 of '249 and claim 20 of '357, and under the circumstances of this case, with the knowledge of what would be done by customers, the activities carried on by Grace were substantially equivalent to what is called for by claim 1 of '249 and claim 20 of '357. Grace is an infringer of these claims (PB 93–96).

In the manufacture of its CBZ–1 product, defendant followed the instructions and requirements of and therefore infringes claim 19 of the '357 patent (PB 93).

Claim 15 of '249 and claim 32 of '253 are directed to the use of catalysts in

cracking operations. Each of the accused catalysts are within the catalyst descriptions and meets all of the requirements of claim 15 of '249 and claim 32 of '253 (PB 93–96).

The accused catalysts were specially adapted for sue in cracking gas oil to produce gasoline. They were not otherwise staple articles of commerce having a substantial non-infringing use. The accused catalysts were recommended by defendant to be used in gas oil cracking and indeed, defendant's customers within the United States used them for that purpose. Defendant's salesmen recommended that each of the accused catalysts be used for gas oil cracking and assisted customers in so using them (PB 93–96).

Defendant's customers within the United States and subsequent to July 7, 1964, followed the instructions and requirements of claim 15 of '249 and claim 32 of '253 in the catalytic cracking of gas oil to produce gasoline commercially. Grace had knowledge of its customers' practices in this respect and indemnified its customers with respect thereto. Defendant actively induced these acts of infringement by its customers and contributed to that infringement (PB 93–96).

The Court finds that the plaintiff Mobil Oil Corporation is entitled to judgment enjoining the defendant W. R. Grace & Company, its officers, servants, agents, and those in privity with it, from further infringement of Plank and Rosinski's United States Patents Nos. 3,140,249, 3,140,253, and 3,436,357; and to an accounting for damages to which plaintiff is entitled as a result of defendant's past infringement. The parties shall settle and submit a suitable order within fifteen (15) days. So ordered.

The findings of fact as they appear in this memorandum shall constitute the Court's findings of fact in this case, pursuant to Rule 52(a), Fed.R.Civ.P.; the conclusions of law annexed hereto

are attached and incorporated herein by reference as Appendix "A".

## APPENDIX "A"

### Conclusions of Law

1. This Court has jurisdiction of the parties and of the subject matter of this action. 28 U.S.C. §§ 1338, 2201. Venue is proper. 28 U.S.C. § 1400(b).

2. Plaintiff Mobil Oil Corporation is the owner of Plank and Rosinski United States Patents Nos. 3,140,249, 3,140,253, and 3,436,357.

3. Charles J. Plank and Edward J. Rosinski are the original and first inventors of the subject matter disclosed and claimed in United States Patents Nos. 3,140,249, 3,140,253, and 3,436,357.

4. Plank and Rosinski United States Patents Nos. 3,140,249, 3,140,253, and 3,436,357 are presumed valid and the burden of proving invalidity is on the defendant. 35 U.S.C. § 282.

5(a). Although not necessary to its ultimate holding, the Court concludes that the Plank and Rosinski notebook records dated on or about January 25, 1957 show an appreciation of and led directly to a reduction to practice in 1957 of the '249 patent in suit.

5(b). Plank and Rosinski began work on the invention of their United States Patent No. 3,140,249 on January 25, 1957 and reduced it to practice in 1957. United States Patent No. 3,140,249 is accordingly entitled to a date of invention of at least August 1957.

6. Plank and Rosinski conceived of the invention of their United States Patent No. 3,436,357 in February 1960 and reduced it to practice by June of 1960. United States Patent No. 3,436,357 is accordingly entitled to a date of invention of at least June 1960.

7. Plank and Rosinski conceived of the invention of their United States Patent No. 3,140,253 in June 1960 and reduced it to practice by July 1, of 1960. United States Patent No. 3,140,253 is

accordingly entitled to a date of invention of at least July 1, 1960.

8. Plank and Rosinski United States Patent No. 3,140,253 is entitled to rely for priority on the following United States Patent Applications: Serial No. 42,284 filed July 12, 1960; Serial No. 215,272 filed August 7, 1962; and Serial No. 215,291 filed August 7, 1962. 35 U.S.C. § 120.

9. The Hart and Bourguet United States Patent No. 3,193,493, which is assigned to plaintiff Mobil, has a filing date of October 17, 1960, which is later than the invention dates of each of the Plank and Rosinski United States Patents Nos. 3,140,249, 3,140,253, and 3,436,357 and later than the effective filing dates of Plank and Rosinski's United States Patents Nos. 3,140,249 and 3,140,253. It therefore is not effective as prior art against any of United States Patents Nos. 3,140,249, 3,140,253, and 3,436,357. 35 U.S.C. §§ 102(e), 103.

10. The 1959–1960 unpublished experiments, notebook records and internal reports of Hart, Bourguet and Frabetti of Mobil are not effective as prior art against the Plank and Rosinski United States Patents Nos. 3,140,249, 3,140,253, and 3,436,357. 35 U.S.C. § 102.

11. The unpublished experiments, notebook records and reports of Mobil's employees, Weisz and Frilette, are not effective as prior art against Plank and Rosinski United States Patents Nos. 3,-140,249, 3,140,253, and 3,436,357.

12(a). The unpublished idea written by Schwartz, a Mobil employee, in his notebook in 1958 is not effective as prior art against Plank and Rosinski United States Patents Nos. 3,140,249, 3,140,253, and 3,436,357.

12(b). The unpublished idea written by Rabo of Union Carbide in his notebook in 1959 is not effective as prior art against the Plank and Rosinski United States Patents Nos. 3,140,249, 3,140,253, and 3,436,357.

13. The earliest date for any experiment carried out by Esso Research and Engineering is January 1, 1962, which is after the invention dates of Plank and Rosinski's United States Patents Nos. 3,140,249, 3,140,253, and 3,436,357 and after the effective filing dates of Plank and Rosinski's United States Patents Nos. 3,140,249 and 3,140,253. For that reason and also because they constitute abandoned experiments, they are not effective as prior art against the Plank and Rosinski United States Patents Nos. 3,140,249, 3,140,253, and 3,436,357.

14. The unpublished interim thoughts, experiments, notebook records and writings of Plank and Rosinski are not prior art against the Plank and Rosinski United States Patents Nos. 3,140,249, 3,140,253, and 3,436,357.

15. The inventions disclosed and claimed in Plank and Rosinski United States Patents Nos. 3,140,249, and 3,436,357 are novel, and are not anticipated by the prior art. 35 U.S.C. § 102.

16. The inventions disclosed and claimed in Plank and Rosinski Patents Nos. 3,140,249, 3,140,253, and 3,436,357 would not have been obvious to a person having ordinary skill in the art to which those patents pertain at the time the inventions thereof were made or as of 1960. 35 U.S.C. § 103.

17. The differences between the subject matter as a whole of the inventions disclosed and claimed in Plank and Rosinski's United States Patents Nos. 3,140,249, 3,140,253, and 3,436,357 and the prior art, would not have been obvious to a person having ordinary skill in the art to which those patents pertain at the time the inventions thereof were made or even as of 1960. 35 U.S.C. § 103.

18. Claims 1, 15 and 19 of Plank and Rosinski United States Patent No. 3,140,249; claims 19, 23, 24, 28 and 32 of Plank and Rosinski United States Patent No. 3,140,253 and claims 7, 9, 10, 17, 19 and 20 of Plank and Rosinski United States Patent No. 3,436,357 are valid and enforceable.

19. The specifications and claims of the patents in suit fully comply with the requirements of 35 U.S.C. § 112.

20. The patent applications resulting in the patents in suit were solicited in complete good faith and with full candor and are and have always been enforceable.

21. The most pertinent prior art was considered by the Patent Office before granting each of the patents in suit. The normal presumption of validity accorded the patents in suit is therefore strengthened.

22. The normal presumption of validity accorded United States Patent No. 3,436,357 is reinforced because that patent has already been adjudicated valid.

23. The catalysts of the patents in suit have been remarkably commercially successful. While commercial success is not a substitute for invention, it is evidence thereof.

24. The fact that defendant copied the inventions of the patents in suit rather than the prior art is further evidence of invention.

25. The fact that the catalysts of the patents in suit promptly displaced the best prior art commercial catalyst, in use for more than 20 years, is persuasive evidence of the validity of these patents.

26. The fact that defendant hailed the catalysts of the patents in suit as a "breakthrough of major proportions" and as "the most . . . significant catalyst advance in . . . 27 years" is persuasive evidence that the inventions of the patents in suit were not obvious.

27. The fact that the patents in suit involve catalytic behavior which is inherently unpredictable, reinforces the normal presumption of validity.

28. The remarkable performance achievements and synergisms of the patented catalysts are persuasive evidence that these catalysts embody patentable combinations.

29. The Fleck et al patent does not constitute an anticipation of the claimed invention of the United States Patent No. 3,140,249.

30. The facts that the individual elements of the catalysts of the patents in suit were available to the art, that industry-wide research was conducted over a period of years in an effort to improve the catalysts then in use, that all such efforts were unsuccessful and that when the catalysts of the patents in suit appeared they displaced the best prior art commercial catalysts which had been used for 20 years are persuasive evidence of non-obviousness.

31. The fact that the prior art contains numerous negative teachings which would have discouraged and deterred a person having ordinary skill in the art from making the inventions of the patents in suit is further evidence of non-obviousness.

32. When news of the patented catalysts first reached scientific experts in the art, they were skeptical of the feasibility of the patented catalysts. After reviewing the results of tests conducted using the patented catalysts, at least one of those experts subsequently hailed the inventions as being "revolutionary". This is persuasive evidence of non-obviousness.

33. A patent which is obscure and ambiguous in its teaching is too indefinite to be utilized as a reference.

34. Since the inventions of the patents is suit were not obvious to persons having more than ordinary skill in the art, they were not obvious to persons having ordinary skill in the art.

35. Defendant has infringed claims 1, 15, and 19 of Plank and Rosinski United States Patent No. 3,140,249; claims 19, 23, 24, 28 and 32 of Plank and Rosinski United States Patent No. 3,140,253; and claims 7, 9, 10, 17, 19 and 20 of Plank and Rosinski United States Patent No. 3,436,357. 35 U.S.C. § 271.

36. The accused catalyst compositions embody the substance of the inventions of the patents in suit. The accused catalysts perform in substantially the same way to obtain the same results as the patented compositions and therefore infringe.

37. The accused catalysts fall clearly within the words of the asserted claims and therefore infringe.

38. The accused catalysts function in substantially the same manner to attain the same results as the patented catalysts and therefore are complete equivalents of the patented catalysts.

39. The patents in suit embody pioneer advances and are entitled to a wide breadth of protection under the patent law.

40. The burden of proving a misuse defense rests with the party asserting it.

41. To the extent that defendant has argued that Mobil's "defined field" licenses are inherently unlawful because they contain a grant under more than one patent, the argument must be rejected as a matter of law. There is nothing intrinsically unlawful in such licenses.

42. The key question with respect to Grace's claim of unlawful package licensing is whether there has been "coercion" exerted on the licensee to accept a license under more patents than it desires, or whether a license under one patent has been "conditioned" on the licensee's accepting a license under other unwanted patents. Since the facts establish that Mobil did not "coerce" any licensee or potential licensee or engage in any unlawful "conditioning" there has been no patent misuse.

43. In order to sustain its charge that Mobil has misused its patents by entering into licensing agreements calling for the payment of royalties on expired patents, Grace must show that Mobil's licenses unambiguously call for the payment of such royalties. The facts of this case establish that Mobil's licenses do not call for the payment of royalties on expired patents and that no licensee or potential licensee has paid or will pay such royalties. Accordingly, there has been no misuse in this regard.

44. Since the royalties paid by the Mobil licensees will be reduced upon the expiration of the ERE patent rights which Mobil has granted, the extension of such rights does not and will not involve the collection of royalties on expired patents. Hence there has been no misuse.

45. Even assuming, *arguendo*, that Mobil did not lower or eliminate the royalties as patents expired, this would still not warrant a finding of patent misuse, unless there were a showing that Mobil coerced a licensee to pay royalties on a group of patents, some of which expired before the others. Defendant wholly failed to establish that Mobil compelled or coerced any licensee or potential licensee in this or any other way, and hence no misuse of the patents in suit has been shown.

46. Since Mobil did not coerce catalyst manufacturers to accept any form of license, the fact that its licensees have entered into licenses permitting them to both (1) make the catalyst product and (2) grant refiners the right to use it in the catalytic cracking process does not establish misuse.

47. The mere licensing of products and process claims or patents together does not constitute misuse.

48. The relationship between Mobil and Kali-Chemie from 1962 to 1966 did not involve illegal "tying," but rather was a joint venture wherein Mobil supplied catalyst component, Kali-Chemie manufactured and marketed the finished catalyst, and they divided the profits equally between them. Such a joint venture is not, without more, illegal, and it certainly does not amount to an unlawful tying arrangement.

49. Likewise, Mobil's sales of catalyst component to Kali-Chemie, a licensee since late 1966, and certain other licensees, under contracts which specifically state that the purchaser is completely free to obtain such component from any source it chooses, do not constitute unlawful tying arrangements. The proof established that neither Kali-Chemie nor any other licensee was required to purchase catalyst component from Mobil as a condition to receiving such a license. In the absence of proof of such compulsion or evidence of acts

which would substantially lessen competition, there is no unlawful "tying" so as to amount to patent misuse.

50. In sum, none of Mobil's licensing practices or policies with respect to its patents relating to crystalline aluminosilicate zeolite catalysts constitutes a misuse of the patents in suit.

51. Plaintiff is entitled to judgment enjoining defendant, its officers, servants, agents and those in privity with it, from further infringement of Plank and Rosinski's United States Patents Nos. 3,140,249, 3,140,253, and 3,436,357 and to an accounting for damages to which plaintiff is entitled as a result of defendant's past infringement. 35 U.S. C. §§ 283, 284.